THE STATE OF IOWA, Appellee, v. W. F. S. MURDY, Appellant.

1. **Murder:** CONTINUANCE: COUNTER-AFFIDAVITS. Where a motion for a continuance is filed by the defendant in a criminal cause, the state may file counter-affidavits controverting the facts on which defendant's motion is based other than the averments as to what absent witnesses would testify to, if present.

2. ———— : ———— : ————. The defendant was indicted for the crime of murder on November 27, 1889, and on the same day was arraigned, and pleaded not guilty. January 28, 1890, that being the second day of the January term, he filed a motion for a continuance upon the ground of the absence of witnesses and the sickness of his attorneys. The state showed by counter-affidavits that all of the witnesses were able to attend court, and that one of defendant's attorneys was able to attend court, and that the other had only recently been employed. The court overruled defendant's motion, but authorized him to make a showing as to the condition of his attorneys and witnesses, February 4. No sufficient showing was made, however, and upon the trial one of the attorneys, alleged to be sick, with the assistance of another attorney, appeared and conducted the case, and all of the witnesses appeared and testified except two, one of whom had removed from the state, but no diligence to obtain his testimony was shown. *Held*, that the motion for a continuance was properly overruled.

3. ———— : EVIDENCE : VERDICT. The evidence in this case reviewed, and *held* to support a verdict of murder in the second degree.

4. ———: EVIDENCE: ANTE-MORTEM STATEMENT. The victim of defendant's assault was wounded in the bowels, causing his death two days thereafter. Some time after the shooting, but on the same day, the county attorney waited upon the wounded man, and, after talking with him, requested that he make a statement for use in court. Such statement was thereupon made, presenting a brief narrative of the material facts connected with the shooting, and reciting that affiant made it freely, that he was in his right mind, and that same was made in the belief that he could not get well of the wound he had received. *Held*, that the statement was competent as a dying declaration.

5. ———: ———: ———: PRACTICE. The fact that evidence as to the competency of an *ante-mortem* statement, in such a case, is for the court, is no reason why it should not be received in the presence of the jury.

6. ———: INSTRUCTIONS. One paragraph of the court's charge instructed the jury that, if they failed to find that the defendant fired the shot in question "wilfully, deliberately and premeditatedly," they should find him "guilty only of murder in the second degree." This paragraph was preceded by an instruction as to the facts necessary to constitute the crime of murder in the first degree, and was immediately followed by instruction that, if they failed to find the defendant guilty of murder in either the first or second degree, they should then determine whether he was guilty of manslaughter, and proceeded to define that crime. *Held*, that considering the whole charge together the paragraph complained of could not have resulted in prejudice to the defendant.

7. ———: ———: SELF-DEFENSE. The use of the expressions "enormous injury," "enormous bodily injury" and "dreadful injury" in the court's charge in relation to the danger which defendant must reasonably have apprehended before he was justified in taking the life of his assailant, *held* not erroneous.

8. ———: ———: ———. An instruction that if defendant went to the shop of deceased with a view to provoking a quarrel he could not avail himself of the plea of self-defense, if he killed deceased in the difficulty thus sought by him, "though such killing may have become necessary to preserve defendant's life, or his person, from an imminent and enormous injury," but that he would be guilty of either murder or manslaughter; *held*, in view of the evidence, not improper.

*Appeal from Appanoose District Court.*—HON. C. D. LEGGETT, Judge.

THURSDAY, JANUARY 22, 1891.

THE defendant was accused of, and tried for, the crime of murder in the first degree, and convicted of murder in the second degree. He was adjudged to be imprisoned in the penitentiary at Fort Madison, at hard labor, for the term of ten years, and from that judgment he appeals.

*G. D. Porter* and *T. M. Fee*, for appellant.

*John Y. Stone*, Attorney General, *C. F. Howell* and *Thomas A. Cheshire*, for the State.

ROBINSON, J.—On the eighth day of October, 1889, Silas Tipton was shot with a pistol in the hands of defendant, and died from the effects of the wound received on the tenth day of that month.

I. The indictment was presented by the grand jury on the twenty-seventh day of November, 1889, and, on the same day, the defendant was arraigned, and pleaded not guilty. On the twenty-eighth day of January, 1890, that being the second day of the January term of court, the defendant filed an application for a continuance. The application was based on the alleged sickness of attorneys, and the absence of witnesses, and was supported by affidavits. Objections and counter-affidavits were filed on the part of the state, and the application was denied, but with leave to defendant to amend it. Additional affidavits were filed by defendant, and objections and counter-affidavits were again filed by the state. The application was sustained as to the witness, Ida Blanchard, unless the state would admit that she would testify to the facts stated in the affidavit for a continuance, if present. The state then admitted that she would so testify, and the cause was continued until the afternoon of the fifth day of February, and a continuance for the term was refused. At the same time the parties were ordered to make a showing on the fourth day of February, as to the condition of defendant's counsel, and as to any witness

1. MURDER: continuance: counter-affidavits.

who should be unable to testify at that time. No show-
ing was made by defendant on the fourth, but on the
next day he filed a showing with regard to the witness
Ledbetter. To that showing the state filed objections
and counter-affidavits, and the application was overruled.

The appellant complains of several rulings on the
application. He insists that it was improper to per-
mit the filing of counter-affidavits. Those filed tended
to show that the alleged sickness of the attorneys for
defendant did not exist; that one of them was not in
fact employed until about the time the cause should
have been ready for trial, if then, and that the wit-
nesses, who, it was claimed, were sick and unable to
attend court, were in fact in good health, or in such
condition of health that they could readily attend court
without danger of injury. None of the counter-affida-
vits sought to contradict the averments of the affidavits
as to what the testimony of the witnesses would be. It
was held in *State v. Rainsbarger*, 74 Iowa, 199, that
other allegations of fact might be contradicted by
counter-affidavits. See, also, *State v. Wells*, 61 Iowa,
630. The counter-affidavits filed in this case were proper
under the rule adopted in those cases.

II. It is said that the application for a continuance
should have been allowed notwithstanding the counter-
affidavits. It appears that defendant was.
notified before January that the state would
demand a trial at the January term. The showing on
the part of the state to the effect that one of the attor-
neys for the defendant was able to appear in court and
discharge his duties as an attorney; that the other was
only recently employed; and that all the witnesses who
were alleged to be sick were in fact able to attend court
and to testify, was so strong that we think the ruling of
the court was fully sustained as to those persons. More-
over, it appears that all the witnesses who were alleged
to be sick, excepting two, appeared and testified in the
case. The court authorized defendant to make a show-
ing on the fourth day of February as to the condition of
his attorneys and witnesses. No showing was made on

2. THE same.

that day, but, on the next, there was a showing made in regard to one witness, and that was insufficient of itself, and was contradicted by counter-affidavits. A. P. Cloud was alleged to be a material witness, who had moved from the state, but no diligence to obtain his testimony was shown.   One of the attorneys, alleged to be too unwell to conduct the case for defendant, appeared and acted for him.   He was assisted by another who was called into the case but a short time before the trial was commenced.   The defense seems to have been conducted with intelligence and ability.   If there was reason for a continuance on the fourth of February, defendant failed to show it.   After a careful examination of the record, we conclude that the application for a continuance was properly overruled.

III.   The appellant contends that the verdict is not supported by the evidence.   While there is much conflict in the evidence, we think the jury might have found the material facts of the case to be substantially as follows :   At the time of the shooting, defendant was a practicing physician of Moulton, and Tipton was conducting a meat market in that place.   There was bad feeling between the men, defendant having accused Tipton of interfering with his business to his prejudice, and each had threatened injury to the other.   On the eighth day of October, 1889, defendant left home with his medicine case.   His wife called him back telling him he had forgotten his revolver.   He had been threatened by a man named Thorp, and, it is claimed, carried a revolver on that account.   After he left home with the revolver, his wife sent a servant named Williams for some meat. Tipton kept the only meat market in the place, and Williams went to him to obtain the meat, but was refused.   Tipton stated as a reason for his refusal that defendant had owed him for more than two years. Williams procured the meat by paying for it with his own money, and took it home.   After a time, Mrs. Murdy sent him to defendant to procure some apples. He went up into the town, and waited on a corner until

he saw defendant approaching. When defendant came up, Williams told him what Tipton had said. Defendant gave his medicine case to Williams and went to Tipton's place of business. That was in a building which stood on the west side of a street which extends from north to south, and fronted east. In the east front of the room occupied by Tipton was one door, and a window on each side of it. There was also a door at the west end of the room. In the southeast corner was a safe containing account-books, and on the safe was a desk. A meat counter extended from the south wall northward to a point about opposite the front door, and eight or ten feet from it. Northwest of the counter were two chopping blocks, on which were cleavers and knives. In the southwest corner of the room was an ice-box. When defendant approached from the south, Tipton was sitting on a box outside, and at the southeast corner of his building. Defendant stepped in front of Tipton, and asked him if he had purchased anything of him during the last year which was not paid for. Tipton said, "Yes." Defendant replied: "You are a damned liar." Tipton then rose from the box, and advanced towards defendant. The latter at once pointed a revolver at Tipton, saying, "Don't do that, or you are a dead man," adding an opprobrious epithet. Where the defendant had kept the revolver, until the moment of presenting, it does not clearly appear, but it is shown that, as he approached Tipton, he carried his hands and arms in a peculiar manner, as though he were concealing the revolver in his sleeve. Tipton stopped when the revolver was presented, and the men indulged in considerable abusive and profane language towards each other. Tipton finally said his books showed the account, and started into his shop, as though to show them, Murdy following, with his pistol in his hand. Tipton turned southward towards the books, but, instead of opening the safe for them, raised the lid of the desk, and took therefrom a heavy stock whip. Seizing it near the small end of the short handle, with which it was provided, he turned towards defendant, raising the handle as

though about to strike. Defendant raised the revolver, pointing it towards Tipton, and the two men approached each other. Tipton caught an arm of defendant, dropped the whip and attempted to prevent the discharge of the revolver. He did not strike, nor attempt to strike, the defendant. About the time he dropped the whip the revolver was discharged, and he received a wound in the abdomen, from the effects of which he died. After the shot was fired, there was some scuffling, the defendant trying to shoot again, and Tipton holding him down and trying to prevent him. Other persons interfered, and the men were separated.

It is claimed on the part of defendant that, when he approached Tipton as he sat on the box, he did so for the purpose of having an amicable settlement, without any intent to cause trouble ; that he did not have his revolver in his sleeve, nor in his hand, until after Tipton rose from the box ; that, when he rose, he presented a dangerous knife, with which he had been whittling, and threatened defendant with it, and that defendant then drew his pistol in self-defense ; that, when Tipton said the books showed the account, and went into the shop, apparently to produce the books, defendant followed him with the revolver in his pocket, and without any thought of further trouble ; that, without provocation, Tipton attacked him with the whip, striking him with it on the head and arms, and that the pistol was discharged in the struggle which followed, without volition on his part ; and that what he did was justifiable in self-defense. We think the jury may well have found that these claims were not well founded. Defendant spoke of the affair soon after it occurred to several persons without claiming that Tipton struck him. He gave as a reason for shooting that Tipton drew the whip on him ; and also stated that he thought he shot him lower down than he did. The remarks, so made, tend to show that the shooting was intentional. There is sufficient evidence to justify the conclusion that defendant went to Tipton's shop in an angry mood, armed with a deadly weapon, so carried as

to be available for instant use, for the purpose of getting satisfaction for a supposed insult; that he was the aggressor in the beginning; that he used language which was calculated to provoke an assault by Tipton when he first met him, when Tipton went into the shop, and until the assault was made; that he took no means of avoiding the collision which his conduct invited, but rather sought it; that he did not retreat, as he might have done, when Tipton approached, but, on the contrary, advanced to meet him; that he did not fire the shot until after Tipton had thrown down the whip, and when he had no reason to apprehend any great personal injury. It is true, that, shortly after the affray, defendant exhibited bruises on the arm and head, and a slight injury to the nose, but they might have been received, during the scuffle, from the counter, ice-box or meat blocks, or may even have been self-inflicted. In our opinion, the evidence is sufficient to sustain the verdict.

IV. The state introduced in evidence a statement made and signed by Tipton a few hours after he was

4. ——: evidence: ante-mortem statement.

shot. It is as follows: "Dr. W. S. F. Murdy sent his hired man to my place for meat this morning, October 8, 1889. I refused to give him meat because I already had an account against Murdy of two years' standing. About ten minutes after hired man left, Murdy came to my shop. He said: 'Why in hell did not you let that nigger of mine have that meat?' I told him I had let him have too much already. He said: 'You damn son of a bitch, I will blow your brains out.' Pulled a revolver in my face, in the presence of M. Hartman and Ralph Davis. I put him off. I went in the shop. He followed. Showed him the account, he cursing all the time. Did not look at the account. Had the revolver out all the time. Pulled the revolver in my face. I pushed it down as far as I could. It went off and shot me in the bowels. Just before he shot, I had a stock whip. I saw he was going to shoot, and dropped the stock whip

and grabbed his arm, and the revolver went off and shot me. I did not try to hit him at any time, nor had no intention of hitting him. Did not want any trouble with him. All this occurred in Moulton, Iowa, on October 8, 1889. I make this statement in my right mind, freely, calling God to be my witness of its truthfulness, for I fully believe that I am mortally wounded, and cannot get well of the wound I received this morning, and, expecting soon to be in the presence of my God, I make this statement.

"[ Signed ]          S. TIPTON."

The appellant insists that it should not have been admitted in evidence, for the following reasons: "*First.* That it was not made in expectation of immediate dissolution, and no proper foundation was laid for its introduction; *second,* that it was only a partial statement; *third,* that no opportunity was given the defendant to introduce evidence affecting its competency." The evidence shows that Tipton was convinced from the first that the wound was mortal. He was told by a physician that he could not recover. He was suffering great pain, and expected to die soon. Under these circumstances we think the statement was competent as a dying declaration. *State v. Leeper,* 70 Iowa, 751; *State v. O'Brien, ante,* p. 88. Tipton had taken opiates, at the time of making the statement, to deaden the pain he was suffering; but it is shown that his mind was vigorous and clear, and that he was fully conscious of what he was saying. He had not sent for anyone to receive the statement, and had not suggested a desire to make it. Mr. Howell visited him and stated that he desired him to make a statement for use in court as evidence. Mr. Howell appears to have been the county attorney, and, no doubt, wished to procure the declaration or statement for use in prosecuting defendant. There was some talk between him and Tipton before the writing was commenced, but it appears that the language of the statement was dictated by Tipton, and that the instrument was drawn as he

wished it to be. It contains a brief narrative of the most material facts connected with the shooting. The fact that Tipton may have said some things before the writing was commenced, which it does not contain, is not an objection to its use as evidence. It was drawn with deliberation, and, no doubt, it contains what he regarded as a fair and truthful narration of the unfortunate occurrence. We think that is sufficient. In regard to the claim that defendant was given no opportunity to introduce evidence affecting its competency, we would say that he does not appear to have desired such an opportunity. His attorneys cross-examined the witnesses for the state, who testified respecting it, at length, and, so far as we are advised, offered nothing in rebuttal. The only objection offered to the admission of the instrument was that the proper foundation for its introduction had not been laid. We think the objections were not well grounded.

V. It is claimed that evidence as to the competency of the statement should have been received in the absence of the jury, for the reason that its admissibility was a question for the court alone to determine. We know of no rule requiring practice of that kind. Questions in regard to the admissibility of evidence are constantly arising in the trial of causes, and it rarely happens that they may not be heard and determined in the presence of the jury. To require the jury to retire would in most cases involve an unnecessary loss of time, and retard the business of the court. In some cases, doubtless, questions arise which should be tried and determined in the absence of the jury; but we do not think this was a case of that kind.

VI. The eighth paragraph of the charge to the jury is as follows: "8. But, if you fail to find that the shot was fired by the defendant wilfully, deliberately and premeditatedly, as these terms have already been explained, you should find him guilty only of murder in the second degree,

5. ——: ——: ——: practice.

6. ——: instructions.

and return a verdict accordingly." Appellant complains of this as ignoring the fact that he may have been guilty of manslaughter only. Standing alone, it seems to be vulnerable to that objection, but, when considered in connection with the instructions immediately preceding and following it, the fact appears that it could not have been understood by the jury to have the effect claimed. It follows an instruction in which the facts necessary to constitute the crime of murder in the first degree are specified, and was apparently designed to instruct the jury that, if the facts specified were wanting, the offense would only be that of murder in the second degree. It is immediately followed by an instruction which directs the jury that, in case they fail to find the defendant guilty of murder in either the first or second degree, they will then determine whether he is guilty of manslaughter. The court then proceeded to define that crime. We conclude that prejudice could not have resulted from the eighth instruction.

VII. In several instances, the court, in its charge to the jury, used the expressions "enormous injury," "enormous bodily injury" and "dreadful injury," in connection with the danger which defendant must reasonably have apprehended before he was justified in taking the life of Tipton. Appellant objects to the expressions, on the ground that he would have been justified in taking the life of Tipton under the circumstances, as he claimed them to exist, if he had reasonable ground to apprehend great bodily injury to himself, and that the expressions used by the court were calculated to lead the jury to believe that the danger to be feared must be more serious than that of great bodily injury. There is authority for the use of the expressions in question. *State v. Keasling*, 74 Iowa, 532; *State v. Perigo*, 70 Iowa, 663; *State v. Benham*, 23 Iowa, 161. In this case, they were used as the equivalent of "great bodily harm," and, as so used, we think they were not erroneous.

VIII. The seventeenth instruction is as follows: "17. If Silas Tipton said to defendant's hired man that defendant was indebted to him, or that he would not sell to defendant, on credit, until such debt was paid, it was proper and lawful for the defendant, when informed of such claims, to go to Tipton's shop, for the purpose of learning what amount, if any, was owing by him to Tipton, or to pay it; and, if defendant went to Tipton's shop for such purpose or purposes, and not to provoke a difficulty or quarrel with Tipton, he was in the proper exercise of his lawful rights. But, if you find from the evidence that the defendant went to Silas Tipton's shop with a view to provoke a quarrel or bring on a difficulty with Tipton, he was not acting lawfully in doing so, and, in that case, he cannot avail himself of the plea of self-defense in killing Tipton, if he killed him in the difficulty so sought by defendant, though such killing may have become necessary to preserve the defendant's life, or his person, from an imminent and enormous injury; but he would be guilty of murder or manslaughter, as you find the facts to be, under the rules given you elsewhere in these instructions." There was evidence on which to base the instruction, and it expresses the law as announced in *State v. Neeley*, 20 Iowa, 115.

8. THE same.

IX. Counsel for appellant discuss many other questions involving the correctness of rulings on the admission of evidence, the giving of instructions, and refusing to give instructions, asked by defendant. Some of them are interesting, but we do not think they are sufficiently important to justify us in referring to them separately and at length. Of the forty-nine instructions given, it is argued that more than half are erroneous. It is said that the question of reasonable doubt should have been embraced in each of twenty-one separate instructions specified, although it was referred to, and fully defined in four others. It is not practicable to incorporate in each instruction the exceptions to and modifications of the general rule therein given. To

attempt to do so would lead to prolixity, and tend to confuse rather than to enlighten the jury. Many of the objections made would be well founded, if applied only to parts of the charge taken separately, but are in fact groundless when considered in connection with the charge as a whole. Appellant complains of the refusal of the court to give nine instructions asked by him. So far as they were important and correct, they were incorporated in the charge given. An examination of the entire record satisfies us that the case was carefully tried, and that there is nothing of which appellant can justly complain. It is true the jury might have reached a different conclusion from the evidence submitted, but it was their duty to weigh the evidence, and decide according to it and the charge of the court. We think that the charge of the court was fair to the defendant, and that the record sustains the verdict. AFFIRMED.