## THE STATE v. McCoy, *Appellant.*

### Division Two, October 4, 1892.

1. **Criminal Practice:** ABSENT WITNESSES: CONTINUANCE. A continuance because of absent witnesses will not be granted where the defendant knew they resided out of the state, but used no diligence to obtain their evidence, as shown by counter affidavits filed by the state. (*State v. Bailey*, 94 Mo. 311.)

2. ————: DEMURRER AND PLEA OF NOT GUILTY: TRIAL. Defendant in a prosecution for a felony may at the same time plead not guilty and demur, and, if the demurrer is overruled, the trial proceeds on the plea as if the demurrer had not been filed.

3. ————: EVIDENCE: VERDICT. Where there is sufficient evidence, if credited by the jury, to support a verdict, the latter will not be disturbed by the supreme court.

4. ————; ————. On a trial for murder evidence that a mob gathered in the street to storm the jail and lynch the accused is irrelevant.

5. ———: ———. Evidence that the deceased told defendant that her former lover had come from another place and had threatened to kill her, when not offered as a dying declaration nor as part of the *res gestæ*, is incompetent.

*Appeal from LaFayette Criminal Court.*—HON. JOHN E. RYLAND, Judge.

AFFIRMED.

*P. D. Myer* and *Hicklin & Welborn* for appellant.

*John M. Wood,* Attorney General, for the State.

(1) The testimony sought to be elicited from the defendant by his counsel as to deceased telling him that a man by the name of Wood had come to see her, and had threatened her, was properly excluded. "Declarations of a person, in order to be received in evidence, must be contemporaneous and connected with the principal fact, constitute part of the *res gestæ* or serve to illustrate such principal fact." *State v. Day,* 100 Mo. 248, and authorities cited; *State v. Snell,* 78 Mo. 240; *State v. Evans,* 65 Mo. 574; *State v. Umfried,* 76 Mo. 404; *State v. Swain,* 68 Mo. 505. "In criminal prosecutions the state sustains no such relation to the party injured as will render his declarations admissible against the state." *State v. Curtis,* 70 Mo. 597. (2) The questions asked the defendant on cross-examination by the state, as to when he first thought about the horse getting hurt and getting the blood on him in that way, and as to why he did not make inquiry for deceased that night, were entirely proper; these matters had been referred to in a general way in the examination in chief. On cross-examination the witness may be compelled to answer any question which tends to test his credibility. *Muller v. Ass'n,* 73 Mo. 242. Defendant's credibility may be impeached as any other

witness, except that he may be cross-examined as to any matter not referred to in his examination in chief. *State v. West*, 95 Mo. 139; *State v. Walker*, 98 Mo. 95. (3) The evidence in this case shows conclusively a most brutal and unprovoked murder; the defendant was granted a fair and impartial trial, and the judgment should be allowed to stand.

GANTT, P. J.—The defendant was indicted at the April term, 1891, of the criminal court of Jackson county for murder in the first degree, for the killing of one Mollie Magruder in said county on the fifth day of April, 1891, by striking her on the head with a stone and inflicting thereby a·mortal wound from which she instantly died. He was duly arraigned, a plea of not guilty entered, and the cause set down for trial June 8, 1891. On his application a change of venue was awarded, and the cause removed to the criminal court of LaFayette county. At the October term of the LaFayette criminal court, the defendant filed a demurrer, assigning two grounds therefor: *First.* That the grand jurors were not legally selected. *Second.* That the indictment failed to charge the homicidal act was wilfully, deliberately, premeditatedly and of malice aforethought committed. The indictment itself is a complete refutation of the second ground, and the first is meaningless, and both were properly overruled.

After the demurrer was overruled, the defendant filed his motion and affidavit for continuance, based upon the absence of two witnesses, Mary Wise, a negro woman, and her daughter, Blanch Wise, a young girl. The affidavit alleged that he could prove by them that on the evening that Mollie Magruder was murdered near the Priest of Pallas building, in Kansas City, defendant was continuously in his room on Belvidere

Place, a long distance from the place of the homicide, and never left it, during all the time; that he had caused a subpœna to issue for them directed to Jackson county, dated October 10, 1891; that the cause was set down for trial October 12, 1891, that the subpœna was returned not found, and that he had learned since the convening of the court that both of said witnesses are residents of Colorado. When this application was made, the prosecuting attorney filed the affidavits of three witnesses who deposed that about five days after the murder, Mary and Blanch Wise moved to Colorado Springs, and have ever since lived there; that this was well known to defendant and among his friends in that community; that both said Mary and Blanch were subpœnaed by the state for the grand jury, and at the time the change of venue was granted all the witnesses were called to be recognized to appear in LaFayette criminal court, and when said Mary and Blanch were called they failed to respond, and the marshal then and there, in the presence of the defendant and his counsel, Mr. Myer, stated they had removed permanently to Colorado. Thereupon the court overruled the motion for continuance.

There was no error in this. There was no sort of diligence used in trying to obtain the evidence of the witnesses as was clearly shown by the counter affidavits. *State v. Bailey*, 94 Mo. 311.

The testimony tended to show that Mollie Magruder, the deceased, and the defendant, William McCoy, had been living together for two years as husband and wife, but that they were not married. Mollie Magruder was a negro woman about thirty-five years of age, and made her living by washing. Several months before the commission of this murder, defendant and deceased had a disagreement and quarrel, and from then to the day when deceased was killed they

had frequent quarrels, the defendant on various occasions threatening to kill the deceased; he wanted her to marry him, but she refused to do so on account of his quarrelsome disposition. In order to get rid of him she had determined upon going to her mother, who was then living in Omaha; she was making preparations to go there when she was killed. The defendant opposed her going, and frequently declared that she should never leave the state, and that she should never live with any other man, and that he would kill her before she should leave him.

The killing occurred about 8:20 P. M. on Sunday, April 5, 1891. All day Saturday, the day before, and all day Sunday, the defendant and deceased were quarreling—so much so that a sister of the deceased who was living in the same building, but in different apartments, became uneasy and sent her little nephew down to watch Mollie Magruder, and give the alarm should the defendant attempt to commit any violence upon her. On the afternoon of Sunday, just before dusk or a little before dusk, Mollie Magruder called at her sister's room, stating that she was going after some clothing of Mrs. Phelps and Mrs. Hallett, for whom she was to wash the next day; she left there just about dusk and went for the washing; she first went to Mrs. Phelps' and from there to Mrs. Hallett's; this was between seven and eight o'clock that night; at these places she had the appearance of being troubled on account of the difficulty she and defendant had had that day. She took a bundle of clothes from Mrs. Hallett's and started on her way back home. The evidence shows that defendant had before that time gone with her after the clothing, and knew exactly the route she usually took. The place where the body was found was near the corner of Lydia avenue and Seventh streets. Mollie Magruder and the defendant lived in a

hollow known as Belvidere, a street parallel with and north of Independence avenue.

Mollie Magruder's dead body was found near the Priest of Pallas hall, April 6, 1891; the old base-ball ground is to be seen there, but it has been filled up level with the surrounding surface. About 8:20 Sunday night a man who lived near the corner, about two hundred feet from there, heard three piercing screams in a woman's voice, then after a short intermission he heard groans; his wife was sick, and he did not want to alarm her, and did not go out and see what was the trouble. On the following morning about six o'clock two police officers found the dead body; near the body, was found the bundle which she had taken from Mrs. Hallet's; near her also was found a bloody brick, and close to it near the bundle was found a pipe, which it was conclusively shown belonged to the defendant McCoy; about her body was found also a bloody pocket knife, which was shown to belong to the defendant, and that it had been in his possession that Sunday evening and for some time prior thereto. There were marks of a scuffle in the place where the bloody brick was found; from where the pipe was found up toward the east, there were marks of a considerable struggle and scuffle. The dead body was found lying on the side, mutilated in a horrible manner; one whole side of her head had been beaten in; bloody rocks were found lying around with which the deed had been done; the left side of her head was one mass of bones, flesh and bruises; the woman had been dead for some hours; the body was stiff when found that morning.

The testimony further shows that on the Sunday evening a short time after Mollie Magruder left to go to Mrs. Phelps' and Mrs. Hallett's after the clothing, probably fifteen or twenty minutes after she had gone,

the defendant called at the room of her sister and
asked where she had gone; he was told that she had
gone for the washing, and asked why he had not gone
with her; he said that she had not told him where she
was going, and then left the house; he was seen a
short time afterward, about dusk, going from the
house north to Independence avenue; he was smoking
a pipe at the time; he was seen then to go east on
Independence avenue in the direction where the
murder occurred, and shortly after this he was seen
standing behind the Priest of Pallas barn with a club
in his hand. About nine o'clock that night, or per-
haps a little after nine, he was seen by a negro boy going
home from the direction of the murder, not along the
public street, but through an alley in order to escape
the public thoroughfare; the boy tapped him on the
shoulder and asked him where he was going; he said
he was going home.

It was shown that on that day he had on a pair of
brown pants with stripes in them, and a certain pair of
shoes, which pants and shoes he had on at dusk that
evening when he inquired for Mollie Magruder and
started after her. Between half past nine and ten o'clock
that night he went into the room of Cynthia Jennings,
a sister of Mollie Magruder, and it was noticed that his
clothes had been changed, he had on a different pair of
shoes and a different pair of pants from those he had
on that evening.

The next morning the officers arrested the defend-
ant at the scene of the murder, where he had gone.
He was taken down to his room and the room searched.
In the room were found the shoes which he had on the
Sunday evening before; he had changed them that
night; blood was spattered over the shoes, and blood
was found on the edges of the sleeves of his undershirt;
he was asked about the shoes and admitted that they

were blood-stained, and that he had had them on the night before; he said he did not know how he got the blood. The officers also found bloody water in the bucket in the room; in the room in a stove was found the burnt remains of what appeared to have been a bloody towel. He was taken to the station, and another officer was sent back to search the house. When they went back they broke open a trunk of defendant's, and in the trunk was found the pants that defendant had on that Sunday night, and on the pants were unmistakable blood marks; the places on the pants where the blood marks were found presented the appearance of having been rubbed with a wet cloth.

The defendant after being arrested said to one of the officers that he had been staying up with a sick woman that night *praying;* to another that he had been to church or prayer-meeting. On the witness stand, he testified that he had been to church; and in accounting for the blood marks on his shoes said that a part of a house had fallen on a man and a horse, and that he had assisted the man and the horse and supposed he had gotten the blood in that way; and although it was shown from his testimony that a number of persons were at church, and a number of persons were at the place where the house fell on the man and horse, no witnesses were called to corroborate the testimony of the defendant. He further testified that he and the deceased had had no recent quarrels, and that he had not committed the offense.

The court gave instructions, defining murder in the first degree, and charged the jury that they should find defendant guilty of murder in the first degree or acquit him. Under the instructions the jury found defendant guilty of murder in the first degree. In due time, he filed his motions for a new trial and in arrest, and, as they are identical, will be considered as one.

The prisoner has filed no brief, and this has necessitated an examination of this entire record. The third, fourth and fifth grounds for the new trial are, briefly, that the indictment was insufficient, the court erred in overruling it, and no new plea of not guilty was entered after the demurrer was overruled.

The indictment was complete, following the long-established precedents, and the court committed no error in overruling the demurrer. And it is the well-established rule at common law that a defendant, in a prosecution for felony, may at one and the same time enter his plea of not guilty and a demurrer to the indictment, and, if the demurrer is overruled, the trial proceeds upon his plea of not guilty, as if the demurrer had not been filed. *State v. Reeves*, 97 Mo. 668; 1 Bishop on Criminal Procedure, sec. 762; 1 Chitty on Criminal Law, 435–440.

The sixth ground challenges all the instructions given by the court. No specific error is pointed out. We have read them closely, and they cover every issue tendered by the indictment, plea and evidence. They are such as have been approved over and over again by this court.

Having fully charged the jury on all the questions of law arising on the record there was no error in refusing the two instructions asked by defendant. *State v. Shroyer*, 104 Mo. 441; *State v. Hopkirk*, 84 Mo. 278.

The eighth, ninth and tenth grounds assigned the insufficiency of the evidence to sustain the verdict. There was sufficient evidence, if credited by the jury, to support the verdict, and in such cases it is neither our duty or desire to interfere with the verdict. *State v. Thomas*, 78 Mo. 327; *State v. Musick*, 71 Mo. 401.

The defendant offered, in the cross-examination of one of the state's witnesses, to prove that a mob of

negroes gathered in Belvidere street to storm the jail and lynch the defendant. There was no error in refusing this testimony. It was wholly foreign to the issues on trial.

Defendant also offered to prove by himself declarations made to him by the deceased, that one Wood was a former lover of hers, and had come from Canada and had threatened to kill her. These declarations were not claimed to be a part of the *res gestæ* nor dying declarations, and were most clearly incompetent. The state cannot be bound by the admissions of persons not parties to the record. *State v. Curtis*, 70 Mo. 597; *People v. McLaughlin*, 44 Cal. 435.

We find no error in the evidence admitted for the state. The judgment of the criminal court of LaFayette is affirmed, and Thursday, the twenty-fourth day of November, 1892, is accordingly fixed for the execution of the sentence. All concur.

