Miller v. State, 139 Wis. 57.

MILLER, Plaintiff in error, vs. THE STATE, Defendant in error.

BROMLEY, Plaintiff in error, vs. THE STATE, Defendant in error.

*January 30—April 20, 1909.*

CRIMINAL LAW AND PRACTICE. (1–5) *Continuance: Absence of witness: Counter affidavits: Denial on conditions: Discretion: Review on appeal.* (6–18, 22) *Instructions to jury: Form and language: Discretion: Presumption of innocence: Self-defense: "Reasonable doubt:" Conviction of lesser offense: Harmless errors.* (19–21, 23, 24) *Evidence: Conspiracy: Declarations: Sufficiency.* (25, 26) *Arrest of judgment: Motion for new trial.*

1. An application for a continuance under Circuit Court Rule XIX may be resisted by counter affidavits as to facts other than the materiality of evidence referred to in the moving affidavit, whether the absent witness will furnish the evidence as claimed, and whether, if he does, it will be truthful.

2. Such an application is addressed to the sound discretion of the court, but it satisfactorily appearing that the desired testimony is material to the moving party's case and that all the essentials of Circuit Court Rule XIX are satisfied even in the light of counter affidavits, in the legitimate field for such proofs,— to deny it would be an abuse of discretion.

3. The decision of a trial court on an application for a continuance, within the field of discretion, is conclusive.

4. In case of an application on the part of an accused, for a continuance in a criminal case, the situation being such that it is within the field of discretion whether to grant or deny the same, the court may take the latter course, conditioned upon the prosecution admitting upon the record that the absent witness would, if produced, testify as claimed, the same to be considered by the jury as if testified to by the witness upon the trial.

5. If upon a criminal trial the accused makes such an application for a continuance on the ground of the absence of a witness, which is not within discretion to deny, it is error to do so on condition that such a concession be made as indicated in the last foregoing paragraph, but it may be done upon condition of the prosecution admitting the truth of the testimony which it is claimed the absent witness would give if present.

6. A trial judge may exercise his own discretion as to the mere language used in expounding principles of law, but where there exists a phrasing of an important rule approved by this court, the better administration is to follow it.

7. Neither the statutes nor the unwritten law prevents a trial judge from incorporating all approved requests to instruct in the general charge, so as to cover every phase of the case properly requested by counsel to be given, without repetition and in logical order.

8. The rule as to the legal presumption of innocence excludes the idea that a mere criminal charge is evidence of guilt, rendering instruction as to the latter unnecessary, if such rule is plainly given.

9. The common-law rule as to duty of one attacked to "retreat to the wall" or so far as he can, or so far that to go further would rather increase than decrease the danger,—the "flight rule,"—is no longer the law.

10. If a person is attacked by another, without that other's fault, and such person has reasonable ground to apprehend he is in imminent danger of losing his life or receiving some bodily injury at the hands of such other, he is justified in acting upon such reasonable apprehension, regardless of the real facts, doing whatever to him at the time seems reasonably necessary for his efficient protection, even to taking the life of his adversary.

11. In a prosecution for an alleged criminal homicide, a wrong instruction on the subject of self-defense does not constitute error, harmful to the accused, if in no reasonable view of the evidence could the claimed right to slay in self-defense be sustained.

12. Refusals to instruct on the subject of reasonable doubt, whether of an explanatory nature or not, do not constitute error, if the subject is covered by a proper statement of the rule in the general charge.

13. It is proper to instruct a jury that, if they believe from the evidence beyond a reasonable doubt that the accused is guilty of some offense of criminal homicide within the charge made against him but entertain a reasonable doubt as between a lower and higher degree, they should convict of the lower, rather than of the higher, if satisfied beyond a reasonable doubt from the evidence that he is guilty at least of such lower.

14. Where an instruction is so involved that it did not, in any reasonable probability, impress the minds of the jury with any idea in the case one way or the other, it may be regarded as harmless error.

15. If a witness testifies wilfully falsely as to any material matter in the trial of a case, the jury may, if it sees fit, but is not

Miller v. State, 139 Wis. 57.

bound to, reject all of such witness's evidence not corroborated by some other credible evidence.

16. If one has a doubt which would cause an ordinarily prudent man to pause and hesitate to act in the most important affairs of life, he has a "reasonable doubt" within the meaning of that term, as used in the law.

17. Guilt is proven beyond a reasonable doubt when all the evidence in the case, clearly, impartially, and reasonably considered, is sufficient to impress the judgment of ordinary reasonable and prudent men with a conviction upon which they would act,. without hesitation, in the most important affairs of life.

18. If a person is assaulted on another's premises by the latter and a serious affray results, terminating in the party assaulted leaving such premises, being commanded to do so and not to return, such occurrence does not militate against such other's right of self-defense, in case of such person returning and, without justification by the conduct of such other, creating in the mind of such other reasonable apprehension of being presently killed or receiving some serious bodily injury.

19. In case of the commission of an offense by two or more persons concerting together to that end by prearrangement, a declaration of one after the fact of an incriminating character, is not admissible as evidence against the other, or others, but such. a declaration after the formed, and before the consummation of the, purpose, may be so received.

20. If on the trial of a criminal action it is claimed the offense was committed in consummation of a conspiracy, an incriminating declaration of one member of the conspiracy is not admissible against the other, unless evidence is produced sufficient, in the judgment of the court, to warrant the jury in finding the existence of the conspiracy beyond a reasonable doubt.

21. Where the common design to commit a criminal offense is at an end, whether by accomplishment or abandonment, no one of the conspirators is permitted, by any subsequent act or declaration of his own, to affect the others.

22. A suggestion in the charge to a jury in a criminal case of the existence of a phase of the case prejudicial to the accused, which is not warranted by the evidence, is harmful error.

23. Where two persons are charged with being guilty of having committed an offense of criminal homicide of the first magnitude,. and the claim of the prosecution is that they acted to that end and pursuant to agreement, and there is evidence tending to establish that situation, yet there is room in the evidence for believing, reasonably, that one of the parties did not participate in the design to kill or in anything more than to punish,.

the guilt of the other of the highest offense does not require that one to be so convicted or acquitted.

24. Where upon review of the conviction of a person for a criminal offense, it appears that there was no evidence, in any reasonable view of it, warranting the belief of guilt to a moral certainty, and there was a motion to discharge on that ground, the judgment should be reversed and the cause remanded with directions to grant the motion.

25. The common-law motion in arrest of judgment in a criminal case, with the ancient practice and technicalities in respect thereto, does not exist under the Code. That as to practice covers the subject of criminal as well as of civil trials.

26. A motion, after conviction, to discharge for any ground good at common law in support of a motion in arrest of judgment, or to stay the entry of the judgment for any legitimate cause, may be called a motion in arrest of judgment, but it does not, necessarily, waive the right to move for a new trial, and in case of both motions being made, the order thereof or the deciding of the same is immaterial, so long as the decision on the motion for a new trial precedes the entry of judgment.

[Syllabus by MARSHALL, J.]

ERROR to review a judgment of the circuit court for Taylor county: JOHN K. PARISH, Circuit Judge. *Affirmed* as to plaintiff in error *Bromley;* reversed as to plaintiff in error *Miller.*

The plaintiffs in error were, in due form, charged with the offense of murder in the first degree, in that they, on the 18th day of March, 1906, at the town of McKinley in Taylor county, this state, feloniously assaulted Thomas McGowan with premeditated design to take his life and by such assault effected such design. Such proceedings were in due form had that they were found guilty by the verdict of a jury, and subsequently were in form sentenced as the law seemed to require. The facts as aforesaid are stated in the opinion.

*W. H. Stafford,* for the plaintiff in error *Bromley.*

*John B. Hagerty,* for the plaintiff in error *Miller.*

For the defendant in error there was a brief by the *Attorney General* and *A. C. Titus,* assistant attorney general, and *R. Sleight,* of counsel, and oral argument by *Mr. Sleight.*

The following opinion was filed February 16, 1909:

MARSHALL, J.    These matters were undisputed upon the evidence, or substantially so: In the evening of March 18, 1906, Thomas McGowan, accompanied by several other persons, laborers in a logging camp, in the vicinity of the home of the plaintiff in error *Stephen Bromley,* for whom plaintiff in error *Belle Miller* was housekeeper, visited *Bromley's* house. *Bromley,* in addition to working at times in the woods, conducted a small farm, and kept liquor, cigars, and tobacco for sale.   He knew of McGowan and regarded him as an undesirable fellow to have at his place.    *Belle Miller* had seen him on another occasion when he visited the house and ill-treated her.   She was a person of some considerable intelligence, but a woman of low degree; of questionable character, at least. *Bromley* had heard that McGowan purposed coming to his place to clean out his house and do him personal harm. When he made his appearance, *Bromley* anticipated trouble and requested one or two persons to stand by him in the event thereof.    There were two visitors present other than McGowan and those who accompanied him.    He and his party were somewhat under the influence of liquor when they arrived.    Drinks and cigars were soon called for and there was a season of hilarity lasting some little time.    One of the men went into a side room with *Belle Miller* and after staying a short time returned.    McGowan then went into such room with the woman and after some whispered conversation she came out.    He beckoned her to return but she refused, and accused him of being Thomas McGowan, which he denied. She persisted in her accusation, saying his face could not fool her.    Later she proposed a toast of an immoral character and insinuatingly insulting to McGowan.    There was further drinking, resulting in disputes between McGowan and *Bromley* and the former throwing off his coat and attacking the latter.    At about this time, *Belle Miller* struck McGowan with

a bottle and one of his associates retaliated by striking her or pushing her away. Quite an affray took place in which these three principals took part, as also did some of the others. In the main, however, it was confined to McGowan, *Bromley,* and *Belle Miller.* No one was seriously injured except the woman. She was considerably bruised, particularly about the head, her nose being broken, several teeth loosened, and her lip cut. Her right hand was also badly injured. About the commencement of the affray, or during its progress, *Bromley* ordered McGowan and his associates from the house, but they showed no disposition to obey till firearms were brought into use by *Bromley.* After the affray had continued for a brief space of time, *Bromley* obtained from the room north of the one the company were in a double-barrel shotgun and approached McGowan with it in a menacing manner. In the meantime some of the party had gone outside. *Bromley* raised the gun as if to shoot McGowan and about that time a missile was thrown through the window by one of the party who had left the room. It broke the window and was aimed at *Bromley* or the gun. McGowan took hold of the gun as *Bromley,* apparently, was attempting to use it on him. While the two were contending in this situation, *Bromley* discharged both barrels of the gun, but did not injure any one. Immediately, or shortly thereafter, *Bromley* possessed himself of his rifle from the adjacent room, by which time, or immediately thereafter, McGowan and the last of the party and all but *Belle Miller* had fled to outdoors. All but these three, McGowan, Reiman, and Hartman, except one who had gone home immediately after the shooting, went away from the house up the road to the north 100 feet or thereabouts. The three for a time were out of sight from the door. As McGowan and Reiman went around the corner of the house they met Hartman. McGowan requested the two others to return and procure his hat and coat. The three then returned toward the door, McGowan leading. In the meantime *Brom-*

*ley* had stepped out of the house and stood in front of the door. Whether he had his rifle in his hand as he stepped out, or it was handed to him while he stood at the door or in front thereof, was not observed by the three men who were approaching. It was a pretty cold moonlight night, though not light enough to enable one to make out the countenance of another at the distance away the men were. If there was a light in the house it did not cast its rays through the open door efficiently, if at all. As soon as *Bromley* observed Mc-Gowan approaching, or about that time, the latter, or some one of the other men, asked for the coat and hat. *Bromley* replied by ordering them away. McGowan was then within some twelve feet of *Bromley*. What further occurred between them took place very quickly and is in dispute. Neither McGowan nor any of his party were armed. *Bromley* knew that from the facts that he had not seen any appearance of weapons, or heard any threats to use any, though he pretended on the trial to have apprehended they might have firearms. After the request for the hat and coat and before Mc-Gowan had time to, or did in fact, move any considerable extent toward *Bromley* from where he first observed him, he, *Bromley,* suddenly presented his rifle and fired, killing Mc-Gowan instantly. The bullet struck McGowan slightly below the right nipple and coursed diagonally, but nearly on a plane with the surface of the ground, to a point just under the skin two inches to the left of the center of the spine. He had numerous slight wounds on his body and some powder marks. *Bromley* was skilled in the use of the rifle. It was a 30–30, magazine Winchester, carrying, at full load, nine charges, and was usually kept ready for use to its capacity.

There was some evidence on the part of the accused, given by *Bromley,* tending to prove that *Belle Miller* did not get either of the guns for him, or request him to shoot or know anything about his purpose when he stepped outside the door with the rifle, at least other than that he proposed acting

strictly on the defensive of his person and habitation; that he stepped outside to drive off some of the men who were breaking windows and menacing his safety; that when he commanded McGowan not to approach he added "Or I will shoot;" that McGowan replied he was coming inside, and continued to approach, and then, apprehensive of losing his life or receiving serious bodily injury if he did not act quickly, he fired the fatal shot. There was evidence on the part of the state, as was supposed, tending to show that *Belle Miller*, on both occasions, procured the gun for *Bromley;* that when he stood in front of the door and observed some one approaching he demanded to know who it was, and exclaimed, "Get out!" that the reply was a request for the hat, to which *Bromley* answered back, "You are McGowan," and without previously exhibiting the rifle so it was observed, or threatening to shoot and giving time for McGowan to retreat, he fired.

On an application for a continuance on behalf of the accused upon affidavit in compliance, as to form, with Rule XIX of Circuit Court Rules and covering in substance the essentials therein prescribed, the court decided that it was proper to consider counter affidavits respecting whether proper diligence had been used to secure the attendance of the witness whose testimony was desired, but not the materiality of his evidence or its truthfulness, and such counter affidavits were received accordingly, and were considered in reaching a conclusion in favor of the prosecution.

There is no statute in this state governing the matter of whether counter affidavits are proper or not and no settled judicial policy in respect to the matter found in the adjudications of this court. Neither is there any definite universal rule deducible from the decisions elsewhere. In some jurisdictions it is held that on an affidavit for a continuance in strict compliance with the statute, the court is bound to grant it and cannot exercise any measure of discretion; that counter affidavits cannot be used at all. *Chicago P. S. Exch. v. Mc-*

*Claughry,* 148 Ill. 372, 36 N. E. 88; *Gandy v. State,* 27 Neb. 707, 43 N. W. 747, 44 N. W. 108; *Barton v. McKay,* 36 Neb. 632, 54 N. W. 968; *Cutler v. State,* 42 Ind. 244; *Eslinger v. East,* 100 Ind. 434, are good illustrations, to which many more might be added.

In quite as many, if not more, jurisdictions, it is held that there is no arbitrary rule on the subject; that the application is addressed to the sound discretion of the court in the broadest sense; that counter affidavits may be received as to facts other than the materiality of the evidence, its truthfulness, and whether the witness will give the evidence or not, and that the court's discretion will not be disturbed on appeal except for a very clear abuse of its discretionary authority. See *George, Weeks & Co. v. Swafford Bros.* 75 Iowa, 491, 39 N. W. 804; *State v. Murdy,* 81 Iowa, 603, 47 N. W. 867; *State v. McCoy,* 111 Mo. 517, 20 S. W. 240, as to impeaching the claim of diligence; *Cushenberry v. McMurray,* 27 Kan. 328; *Lascelles v. State,* 90 Ga. 347, 375, 16 S. E. 945, as to want of good faith; *Hyde v. State,* 16 Tex. 445, as to improbability of the witness being obtainable at all or within any reasonable time; *State v. Murdy,* 81 Iowa, 603, 47 N. W. 867, as to inability to procure the witness because of his being sick; and *State v. Bailey,* 94 Mo. 311, 7 S. W. 425, as to necessity for postponement because of sickness of counsel. And many other illustrations of that nature are at hand.

In some jurisdictions, use of counter affidavits in respect to such matters is regarded as a matter of right, while in others it is held that they may be used or not in the sound discretion of the court. *State v. Dettmer,* 124 Mo. 426, 27 S. W. 1117.

An understanding of the numerous adjudications in the vast field covered by them requires a careful comparison thereof with statutory regulation and court rules. In some jurisdictions there are definite written rules or laws governing the subject to which the adjudications are referred, as if a more severe rule, one way or the other, would prevail were

the matter left to unwritten law. In some jurisdictions holdings may be found on every phase of the subject, referable to judicial law solely.

The foregoing brief review is sufficient to show the utter impracticability of obtaining any certain guide from decided cases, so we may well take our bearings from the broad, liberal scheme of our Code and such incidental holdings as are found in our own cases.

The dominant principle of our Code is that justice shall be administered with little regard to technicalities, and even errors which do not, appreciably, prejudice the rights of the parties (sec. 2829, Stats. 1898); that to such end trial judges should exercise broad discretionary authority respecting many matters not regulated otherwise, definitely, by the written law, affording the parties the fullest opportunity by the simplest methods practicable in the judgment of the judicial administrator, the practice by one not being more than advisory as regards another,—for vindicating their rights, consistent with reasonable, economical, speedy, and certain attainment of justice; the initial decision in this broad field of discretion to be the infallible rule for the particular case or proceeding, unless so manifestly contrary to any fair standard of human judgment as not to be sustained in any reasonable view.

So this court has adopted the rule that an application for a continuance, with such limitations as are contained in the circuit court rules, is addressed to the sound discretion of the trial court. *Gear v. Shaw,* 1 Pin. 608; *Hayes v. Frey,* 54 Wis. 503, 11 N. W. 695; *McMahon v. Snyder,* 117 Wis. 463, 94 N. W. 351.

True, when an application for continuance is based on an affidavit making the showing required by Rule XIX and fully satisfying the essentials thereof, which it may or may not do according as it shall be opposed by counter proofs so far as permissible, it should be granted as a matter of right.

*Gonring v. C., M. & St. P. R. Co.* 78 Wis. 16, 47 N. W. 18. But that is because to deny it would be a manifest abuse of discretion. However, whether the showing contained in the affidavit sufficiently establishes the facts required, particularly as to the use of diligence to prepare for trial, and shows some reasonable probability that a continuance will enable the applicant to procure the attendance of the absent witness within some reasonable time, are within the field of sound judgment.

It is not true that, merely because the applicant states he has used due diligence to prepare for the trial and states the facts in that regard, such facts are, necessarily, to be taken as establishing the essentials of due diligence. That is left within the field of discretion to decide. Nor is it true, if all of the essentials mentioned in the rule are satisfied in the judgment of the trial judge, that a continuance must be granted merely because the applicant cannot safely proceed to trial without presence of the absent witness. If it were, cases would arise which could never be pressed to trial. So then there must appear some reasonable probability, at least, that the absent witness, or testimony, can be procured in case of the continuance being granted.

In view of the foregoing, on principle, in vindication of our system indicated, it seems that, as to matters within the discretionary field, and all matters aside from the materiality of the testimony, and whether the absent witness will testify as claimed, and whether, if so, his evidence will be true, counter affidavits may be permitted,—in some instances ought to be; that such practice is essential to the due administration of justice. That harmonizes with the ruling of the circuit judge, made with full appreciation that he was dealing with an open question, in the main, as regards practice in this state.

The conclusion thus reached is not out of harmony with *Davis & R. B. & Mfg. Co. v. Riverside B. & C. Co.* 84 Wis.

262, 54 N. W. 506, while it has some support in *Schamper v. Ullrich*, 131 Wis. 524, 111 N. W. 691.

The better rule, if not the weight of authority elsewhere, supports the foregoing, and on that we cite the following additional authorities: *Johnson v. State*, 65 Ga. 94; *Brown v. State*, 65 Ga. 332; *Matthews v. Bates, K. & Co.* 93 Ga. 317, 20 S. E. 320; *Salisbury v. Comm.* 79 Ky. 425; *Riggs v. Fenton*, 3 Mo. 28; *State v. Murdy*, 81 Iowa, 603, 47 N. W. 867; *St. Louis & S. F. R. Co. v. Woolum*, 84 Tex. 570, 19 S. W. 782; *Walt v. Walsh*, 10 Heisk. 314; *Dimmey v. W. & E. G. R. Co.* 27 W. Va. 32; *People v. DeLacey*, 28 Cal. 589; *Allen v. Reilly*, 15 Nev. 452.

The circuit court, in view of the counter proofs within the limitation above indicated, and supplemental proof, which the accused were allowed the amplest opportunity to present, held that such diligence was not shown as to entitle them to a continuance; yet with abundance of caution, regarding the application to be within judicial discretion to grant or deny, refused to compel the accused to go to trial, except upon condition of the prosecution consenting to admit upon the record that the absent witness, if present, would testify as claimed in the application, the testimony so brought into the trial to be weighed by the jury the same as if given in court in the ordinary way and to be likewise subject to be discredited by other testimony. That was done, the prosecution submitting to the condition and the accused taking advantage of it, protesting, however, that they were entitled to the continuance on the affidavit presented therefor, and on the whole case as well, and that it was erroneous to supersede that right by the concession exacted or to give such concession weight in the exercise of discretion.

Some of the questions thus raised might be passed without deciding them, since the court is of the opinion that there was no clear abuse of discretion in holding that the accused were not entitled to a continuance on the case made therefor.

Notwithstanding such decision, it was doubtless competent to grant the continuance, so the question is presented whether, in case the way is open in a criminal prosecution to either deny or grant a continuance on application of the accused, it is harmful error, or error at all, to incline to the side of the prosecution on condition, as in this case.

The affirmative of the foregoing would seem too evident to require discussion.

True, in face of the constitutional rights secured to accused persons by written constitutions generally, to compel the attendance of witnesses in their behalf and to have them orally examined upon the trial, there are holdings that a law or a judicial rule requiring them to take, in lieu thereof, a concession from the prosecution, as in this case, is a violation of a fundamental privilege. *People v. Diaz,* 6 Cal. 248; *Graham v. State,* 50 Ark. 161, 167, 6 S. W. 721; *Newton v. State,* 21 Fla. 53, 70; *State v. Loe,* 98 Mo. 609, 12 S. W. 254; *State v. Dyke,* 96 Mo. 298, 9 S. W. 925; *People v. Fong Chung,* 5 Cal. App. 587, 91 Pac. 105. We venture to say in passing that such instances are very few as compared with those to the contrary. *Territory v. Guthrie,* 2 Idaho, 432, 17 Pac. 39; *State v. Felter,* 25 Iowa, 67, 73; *State v. Shannehan,* 22 Iowa, 435; *State v. Bartley,* 48 Kan. 421, 29 Pac. 701; *State v. Lund,* 49 Kan. 580, 31 Pac. 146; *Territory v. Harding,* 6 Mont. 323, 12 Pac. 750; *McNeally v. State,* 5 Wyo. 59, 36 Pac. 824; *Comerford v. State,* 23 Ohio St. 599; *DeArman v. State,* 77 Ala. 10; *Dean v. State,* 89 Ala. 46, 8 South. 38; *Comm. v. Donovan,* 99 Mass. 425; *Carmon v. State,* 18 Ind. 450. Some courts have gone so far as to hold that even an admission of the truth of the alleged testimony cannot deprive an accused of his constitutional privilege. *Goodman v. State,* Meigs (Tenn.) 195. Some courts have held one way on the main question and later held another, notably that of Missouri and that of Arkansas.

Passing the question of constitutional right, there are

many authorities holding that it is an abuse of discretion to force an accused person to trial in the absence of a witness whose testimony he desires, and in face of an adequate showing for a continuance, without a full concession upon the record of the truth of the facts to which it is alleged such witness will testify. A long line of cases so holding will be found in 4 Ency. Pl. & Pr. 886. We may well note that they are mostly quite ancient, while the authorities holding to the contrary are quite recent. However, we must confess that the text-writers, as a rule, seem to regard the weight of authority and the better rule to be that way. This court subscribes to that rule, especially in view of constitutional rights. My personal view is that, upon a full concession being made, as in this case, even in the event of a good case made for a continuance, it not only is within the discretion but the discretion ought to be exercised, to proceed with the trial under some circumstances. That the constitutional right to have one's witnesses, in case of a criminal prosecution against him, testify upon the trial, does not mean under all circumstances. Otherwise, the wheels of justice might be impeded, to great public detriment, without really subserving any private right except in a technical sense. In case of great prejudice to public interests by delay, and the accused having had, without success, the amplest use of all legal instrumentalities to compel attendance of his witness, and it appearing that further postponement will furnish only a bare possibility, or a remote probability, of better success, the court should not only have the power to proceed with the trial upon a concession being made, as here, but it might be its duty to the public to do so and a favor, instead of a prejudice, to the accused; certainly not a violation of any constitutional right reasonably administered. It is the opinion of the court that in case of the presentation for a continuance being so weak that the trial court might decide either way, then, in its discretion, it may grant or deny the application, according to whether the

adverse party will make a concession such as was exacted here.

. The learned court prefaced instructions to the jury, requested by counsel for the accused, by this:

. "Under the law of this state, it is the duty of the trial judge to submit all questions of law prepared by counsel in the language of counsel, or refuse the same. The supreme court of this state have also said that a charge should never be more than three pages in length. I find myself 'between the Devil and the deep sea,' with all respect to the legislature of the state and the supreme court, as the instructions asked for by counsel for defendants, although I have attempted to prevent any repetition, far exceed the limit prescribed by the supreme court. I will now read you the instructions asked for by the defendants' counsel."

After concluding the reading of such requests as were approved, the court called special attention to the fact that they were in the language of counsel, specifying the same by name, and admonished the jury, "I will now charge you in my own language," following it by giving instructions covering seventeen full typewritten pages. /

Counsel for the accused seriously complain of the proceeding indicated, and well they may. Such expressions as were indulged in, rather tend to lower the standard of judicial administration from its proper high level. The learned judge, doubtless, meant no disrespect either to this court or the legislature, or the counsel for the accused, and certainly not to his own high office. Nevertheless, we feel it our duty to say, the attitude displayed was poorly calculated to properly impress the jury with the serious duty waiting to be discharged, and to impress them, efficiently, with the legal principles governing the case. A jury on such an occasion, one involving the liberty of an accused person for all time, so far as he is concerned, should be imbued with the highest respect for the law. An important factor to that end is respect for the superior authority which says, and must say for all, what is and what is

not the law.   That respect breeds respect for the visible administration of the law and the trial court, to which the jury must look as their tutor.   The system must be held up from the fountain head down to, and including, the smallest instrumentalities in the judicial administration.   In that way only can the jury be reached and lifted to a high plane and inspired to do their best work in a case like the one in hand.

This is not said in any spirit of harsh criticism of the painstaking judge who presided at the trial.   We regard the language that was used as mere passing remarks, not intended to have the effect counsel ascribe to them, yet we are not prepared to say they were not likely to create an unfavorable impression derogatory to counsel and the defense and the administration of the law by superior authority, as suggested. It were better, opportunity for the complaint had not been furnished.   Nevertheless, on a survey of the whole situation, we are unable to reach the opinion that the interests, at least of the dominant figure in the case, as it must terminate as hereafter indicated, were in any probability, efficiently prejudiced.

The remarks as to the origin of the requests were not by themselves prejudicial, though it is considered the better practice in giving requests is, to simply give them without mentioning the source of the initiation.   All instructions to a jury are supposed to emanate from the court.   The requests are mere suggestions to move the judicial mind.   There should be no varying degrees of dignity in rules laid down as to whether original with the court or suggested by counsel. Each is the peer of the other.   So, to the end that partisanship should neither be an advantage or disadvantage as to the request that may be made, it is the better practice for the approved requests to be either incorporated into the general charge or be given, strictly, as law from the court.

A judge in charging a jury may exercise his own discretion as to how he shall expound rules of law, though, as has often been said, the approved expressions of important principles

by this court, ought to be followed, especially when special attention is called to them by counsel. Whether they are the best or not, they are the safest. To give a rule, as so phrased, at the request of counsel, and then attempt to give the same rule by an original phrasing, quite different in words and as it is liable to be understood by a layman, especially in case of the former being treated with disfavor, may well be avoided. In the judgment of the writer the better practice is one which is permissible by a long line of our decisions, that is, to incorporate all approved requests into the general charge. That gives opportunity to easily avoid repetition and present all the legal principles applicable to a given situation in that logical order, best calculated to inculcate them, efficiently, upon the minds of the jurors.

The rule that "counsel must formulate in writing the exact words of the instruction he desires given" (*Schroeder v. Wis. Cent. R. Co.* 117 Wis. 33, 42, 93 N. W. 837), and that the principles of law must be given without variation or not at all, does not require an instruction to be given in the precise language used by counsel, or even separately from the general charge, if included therein. This court has given trial courts great latitude in that regard. *Suckow v. State,* 122 Wis. 156, 163, 99 N. W. 440; *Murphy v. State,* 124 Wis. 635, 655, 102 N. W. 1087; *Hughes v. C., St. P., M. & O. R. Co.* 126 Wis. 525, 535, 106 N. W. 526; *Winchel v. Goodyear,* 126 Wis. 271, 278, 105 N. W. 824; *Hayes v. C., M. & St. P. R. Co.* 131 Wis. 399, 407, 111 N. W. 471.

Since the expression of the learned circuit judge as to this court having laid down a rule that "a charge should not be more than three pages in length" has been incorporated into this opinion, it seems best to suggest that this court is not aware of having made any such rule or said anything giving rise to any such idea. The learned circuit judge could not have appreciated the force of his words, for, certainly, had he supposed there was any such rule, consciousness of duty to conform thereto would have prevented the presentation of

the seventeen-page charge in this case.    The jury might well have taken it that this court had made a rule so absurd as to be only worthy of such a spectacular ridicule as the mention of it, followed by the long charge.    A mere passing remark by a judge, perhaps warranted by the particular situation under treatment, as in *Duthie v. Washburn,* 87 Wis. 231, 236, 58 N. W. 380, is neither a rule of court nor a personal suggestion of general application.    What is said here is not to be taken as in any sense a criticism of the length of the charge.    It was full and not too much so.

Now while the lengthy treatment of counsel's assignment of error seems justified, we are inclined to the opinion that an ordinarily intelligent jury would not be liable to be influenced, materially, by the matter complained of.

The court did not commit error by refusing to give the requests to the effect that a mere charge of guilt is not evidence thereof, and no jury should be influenced by that mere fact. So far as that had any bearing on the case, it was fully covered by the language of the general charge as to the presumption of innocence.

Exceptions were taken both to a refusal to give a requested instruction and instruction given on the subject, of duty to retreat, avoiding necessity to take human life in self-defense, all of which may best be considered together.

The court instructed in these words:

"A person who is assaulted and his life put in danger by the assault, or if he is in danger of receiving great bodily harm from such assault, may take the life of his assailant, but should not do so when he can retreat in safety and thereby save his life or save himself from receiving great bodily harm, without taking the life of his assailant, but if a person is assaulted as aforesaid while in his house he would not be obliged to flee out of his house from such assailant."

Counsel for accused requested this to be given:

"If the defendant *Bromley,* at the time the fatal shot was fired, had reasonable grounds to believe and in good faith be-

lieved that the deceased intended to take his life or to do him great bodily harm, he was not obliged to retreat, but was entitled to stand his ground and meet any attack made upon him or which he had reasonable ground to believe was being made upon him in such a way and with such force as under all the circumstances he at the moment honestly believed and had reasonable grounds to believe was necessary to save his own life or to protect himself from great bodily harm."

The request was modified and given as changed, the new element being expressed thus:

"This rule applies where a person is assaulted within his own house. The state claims that the alleged assault, if made at all, was made out of doors, immediately before the firing of the shot which killed the deceased, Thomas McGowan."

Those instructions, in the whole, were confusing, contradictory, and plainly erroneous. They offend against the long-established law of this state. The ancient doctrine requiring the party assaulted to "retreat to the wall," as it is laid down in Blackstone and the early common-law writers, the "flight" rule requiring such party, with some exceptions including defense within one's dwelling, to flee from the presence of danger as far as practicable in a physical sense, or so far that to go further would tend rather to increase than lessen the apparent danger, may have been all right in the days of chivalry, so called, but, by almost common consent of the moulders of the unwritten law, in later years, it is unadaptable to our modern development and, therefore, has been pretty generally, and in this state very definitely, abandoned. It has been superseded by a doctrine in harmony with the divine right of self-defense; the doctrine that when one is where he has a right to be and does not create the danger by his own wrongful conduct, he may stand his ground, if assailed by another, and in case of his honestly and reasonably believing himself to be in imminent danger of losing his life or receiving some great bodily harm at the hands of such other, he may use such means as, presently to him, reasonably, seem

necessary to avert the impending danger, even to taking the life of his assailant.    The supreme court of the United States in *Beard v. U. S.* 158 U. S. 550, 15 Sup. Ct. 962, has laid down the law thus:

"In our opinion, the court below erred in holding that the accused, while on his premises, outside his dwelling house, was under legal duty to get out of the way. . . . The defendant was where he had a right to be, when the deceased advanced upon him in a threatening manner, and with a deadly weapon; and if the accused did not provoke the assault and had reasonable grounds to believe, and in good faith believed, that the deceased intended to take his life or do him great bodily harm, he was not obliged to retreat, nor to consider whether he could safely retreat, but was entitled to stand his ground and meet any attack made upon him with a deadly weapon, in such way and with such force as, under the circumstances, he, at the moment, honestly believed, and had reasonable grounds to believe, was necessary to save his own life or to protect himself from great bodily injury."

It will be seen that the vice of the instruction which the federal court condemned is the very element the trial court, in this case, added to the request presented by counsel. The element of deadly weapon in the hands of the assailant, given some significance in the quoted language, bore only on the question of whether the assaulted had reasonable ground to apprehend the serious danger and necessity for doing as he did to avert it.    The gist of the matter is that a person no longer need flee from danger of personal injury at the hand of another rather than strike him down to avert it, if that danger in honest, reasonable apprehension, is of the grade mentioned, and such striking is so apprehended to be necessary, and such danger is not produced by such person's wrong.    The reasonable, honest apprehension is the key to the justification.    If it turns out that there was no such danger in fact nor any such necessity, the justification, nevertheless, remains unimpaired.

This court fully indorsed what has been said in *Perkins v.*

*State,* 78 Wis. 551, 47 N. W. 827; *Richards v. State,* 82 Wis. 172, 182, 51 N. W. 652; *Frank v. State,* 94 Wis. 211, 218, 68 N. W. 657; *Ryan v. State,* 115 Wis. 488, 502, 92 N. W. 271; *Holmes v. State,* 124 Wis. 133, 142, 102 N. W. 321; *Schmidt v. State,* 124 Wis. 516, 519, 102 N. W. 1071.

An examination of those cases shows that no responsibility rests upon this court for not explaining, clearly, the law of self-defense, so that trial courts need not go astray. It has been done over and over again. The difficulty seems to be in eradicating the ancient rule, as regards general application, while retaining it as to situations where the danger to be averted is created by wrongful conduct on the part of the person assaulted.

Much difficulty will be avoided by trial courts adhering closely to the doctrine phrased in language which has received repeated approval by this court. It may be found best stated in *Frank v. State, supra,* which we reproduce, substantially, with some transposition of words:

The taking of human life is a matter of such deep significance that it cannot be justified by any slight appearance of danger. If the defendant is in fault in creating the situation of danger, his right of self-defense does not arise until he has done all he honestly reasonably thinks he can do, without killing his assailant, to save his own life or save himself from great bodily harm. But the law does not require a person, in order to make out the defense of justification for killing his adversary, to prove that the apprehension or the necessity to resort to that extremity existed in fact. If he has reasonable ground to apprehend that he is in imminent danger of losing his life or receiving some serious bodily injury at the hands of his assailant, he has a right to act, efficiently, upon such reasonable apprehension and employ, what, to him at the time, honestly, seems necessary to that end, even to taking the life of his assailant.

In this connection we repeat that forms of expressing important rules, approved by this court, should be followed by circuit courts. *Buel v. State,* 104 Wis. 132, 80 N. W. 78; *Pumorlo v. Merrill,* 125 Wis. 102, 114, 103 N. W. 464.

The numerous errors in the learned judge's instructions on the law of self-defense stand out plainly when compared with what has been said. When he instructed "in his own language" he made the essential of danger actual instead of in reasonable apprehension. For the right of the party assaulted to stand his own ground, he substituted, duty to flee. Even in case of one making his defense in his own dwelling house, the danger excusing homicide was made actual instead of danger existing, in honest reasonable apprehension, and necessity to go to the extreme, actual, instead of, existent in such apprehension.

The requested instruction was formulated from the decisions of this court. It was faultless. It should have been given in place of what was given, or similar language should have been used. Given with the addition the court made thereto, it repeated a crowning vice of the court's instruction "in his own language" and was inconsistent with, not corrective of, the other infirmity mentioned. Even a correct instruction following an incorrect one, as if the two might stand together, does not cure the error, as one cannot tell upon which the jury relied. *Schmidt v. State,* 124 Wis. 516, 519, 102 N. W. 1071; *New Home S. M. Co. v. Simon,* 107 Wis. 368, 83 N. W. 649; *Eggett v. Allen,* 106 Wis. 633, 82 N. W. 556. In such cases the error is fatal if from the whole charge under all the circumstances it appears probable that the jury may have been prejudicially misled.

The foregoing leads to the secondary question of whether the erroneous instruction was harmful. Manifestly, if the evidence did not disclose any fair ground for the accused to reasonably, honestly apprehend necessity for him to do as he did, to avert, at least, to him reasonably apprehended danger of his receiving serious bodily injury, or our conclusion is that he did not act upon any such apprehension, then the whole theory of self-defense fails; no instruction in regard to it was necessary and the one given, however errone-

ous, was not harmful. *Anderson v. State,* 133 Wis. 601, 614, 114 N. W. 112.

We have the best light in which the evidence can be viewed in behalf of the accused, by taking that of *Bromley* himself, in connection with physical situations and circumstances established conclusively by the evidence. He had no reasonable ground whatever for believing that McGowan or any of his party were armed. We cannot escape that conclusion. During the affray in the house, in which, according to the accused, he contended against at least four persons for a considerable length of time, and though he was somewhat infirm and they—particularly McGowan—were each equal or superior to him in strength, he did it successfully, as regards averting danger of personal injury, no threats were made of taking his life, no weapons were exhibited or mentioned, except by himself. We do not overlook some shadowy suggestions by the accused about some one of the party having had a revolver and that after the assailants went outside the house there were noises like shots. That there were no shots, nor any firearms in possession of the McGowan party, and that the suggestions of the accused in respect to the matter were groundless surmises, as he must have known, seems beyond all manner of doubt. Single handed, substantially, he drove the whole party from the house without receiving any wounds. He had no difficulty in driving all members of the party who were around, as he supposed, away from the house and up the road out of sight, which he did by going outside with his rifle and commanding them to depart at the peril of being shot. A few minutes later he stepped just outside the door again, and was told by one of two men who were visible at some distance away, that McGowan's hat and coat were wanted. The near man, who was not close enough to enable the accused to see who it was, upon being told by the accused he would throw out the hat and coat, threatened, in that event, to throw him out and started to

advance, though told if he did not go away the accused would shoot. It was light enough to enable the latter to see there was only one other man in the vicinity, though it appears there were two, but only one, according to the testimony, was menacing him and that one was a considerable distance away. McGowan had no weapon and made no menace except as stated. The accused had already distinguished himself, as indicated, by coping with several and coming out unblemished. His state of mind, notwithstanding some infirmity claimed, must have been that the one man, even if his associate advanced to aid him, would by no means be formidable. He was quite in obscurity himself, more so than his adversary, as he was in front of the darkened door and the lights in the house had been extinguished. He had several charges in his rifle, probably nine. He was a man of superior courage. That is evident, while his adversary and those with him must have been so intoxicated as to be comparatively harmless to him, as he stood there with the arsenal at his disposal for self-defense. In the circumstances stated he had no reasonable ground to believe but that he could discharge his gun several times to intimidate his adversary and then have ample opportunity to act, efficiently, to take his life, if necessary. The latter was some fourteen feet away, according to the state's evidence, and much further off, we should say, according to the evidence of the accused, when the latter did the fatal deed. He appreciated on the trial that there was no reasonable showing in his evidence for such apprehension of imminent danger as to warrant him in taking deadly aim or to do more than to shoot to intimidate or to maim. So he disclaimed taking aim, said that he fired at random in the general direction of the men without bringing his gun to his shoulder. The physical fact disproves that completely. The place where the ball took effect and its direct course through the body to a lodgment under the skin a short distance below the shoulder blade, demonstrate that the gun must have been

presented in the ordinary way of shooting and aimed at a vital part of the body. If the weapon had been held as the accused claimed, the shot could not have taken effect as it did. In view of the foregoing, we are of the opinion that the circumstances, in any conceivable reasonable view the jury could have taken thereof, did not warrant the accused in taking McGowan's life, as he did. So the errors committed as to self-defense were nonprejudicial.

Refusals of requests on the subject of presumption of innocence, reasonable doubt and explanation thereof, were not prejudicial because proper rules were given in the general charge. Explanatory instructions on the subject of reasonable doubt are proper, and in the view of some courts, and many judges of experience, ought to be given, but whether to do so or not rests in the sound discretion of the trial judge. *Buel v. State,* 104 Wis. 132, 80 N. W. 78. Such explanatory instructions were given in the general charge here to a considerable length and with very fair clearness.

Error is assigned because the court did not give an instruction requested, to the effect that, if the jury were satisfied that any one of the accused was guilty of some offense of criminal homicide beyond a reasonable doubt, but yet entertained a reasonable doubt as to whether it was of a particular or lower degree, the lower offense should be found. Counsel made an attempt to draft an instruction like the one in *Ryan v. State,* 115 Wis. 488, 92 N. W. 271, which was held permissible by construction. The model before counsel was to the effect that in the contingency mentioned the jury should "return a verdict of guilty of the lower offense rather than of the higher." It was supposed the instruction, taken in connection with others given, meant, not that if the jury entertained a reasonable doubt as to whether the accused was guilty of either of two grades of offenses he should be convicted of the lower, but if they believed he was guilty at least of one of them, but there was yet a reasonable doubt as

between the two, the verdict should be for the lowest the evidence established with the requisite degree of certainty. We hardly think the requested instruction would have given the jury any better guidance than the general instructions, which seem fairly to have covered the point. By them the jury were, in effect, told that in rendering a verdict of guilty, it should be for no greater offense of criminal homicide than they believed with the degree of certainty pointed out the person convicted was guilty of.

Error is assigned on this instruction:

"If you find that the testimony of any witness has, when you consider the whole evidence, been impeached, then you may reject the testimony of such witness entirely if you see fit, unless it is corroborated by some testimony or by some evidence which you believe to be true."

Just what idea the learned court had in mind in giving that to the jury is difficult to discover.

It is quite probable that, because of its indefiniteness, the jury did not understand it and so gave it no effect whatever. Such conditions are not entirely novel and do not necessarily involve harmful error as indicated in *Buel v. State, supra.*

If it were thought by the quoted language to instruct on the subject of *"falsus in uno, falsus in omnibus,"* it is unfortunate that the usual and approved language, with which the court was, of course, perfectly familiar, was not adopted. Such course has been frequently advised and is the one most likely to be taken by the careful judge ordinarily, without any admonishment. Comparing the instruction with such approved language, the semblance is so shadowy as to suggest that the trial court had a different subject in mind. If that be so, it explains why the approved form of expression, counsel for accused claim should have been used, was not. Such approved form is formulated usually in this or similar language: *If a witness testifies wilfully falsely as to any material matter in the trial of a case, the jury may, if they*

*see fit, but are not bound to, reject all of such witness's evidence not corroborated by some other credible evidence.* This, with the following cases showing sanction of it and variations from it which have been held harmful, or at least subject to criticism, will furnish a most certain guide to go by: *Mercer v. Wright,* 3 Wis. 645; *Allen v. Murray,* 87 Wis. 41, 46, 57 N. W. 979; *Little v. Superior R. T. R. Co.* 88 Wis. 402, 407, 60 N. W. 705; *Cahn v. Ladd,* 94 Wis. 134, 68 N. W. 652; *F. Dohmen Co. v. Niagara F. Ins. Co.* 96 Wis. 38, 71 N. W. 69; *Patnode v. Westenhaver,* 114 Wis. 460, 90 N. W. 467; *Suckow v. State,* 122 Wis. 156, 99 N. W. 440; *Hart v. Godkin,* 122 Wis. 646, 653, 100 N. W. 1057.

The language of the charge, "If you find that the testimony of any witness has, when you consider the whole evidence, been impeached," from the context seems to indicate that it referred to any one of various methods stated of showing that testimony is false.

By the reference to the witness's testimony, instead of to the witness, or to some particular item of testimony directed to some material point, the jury must have thought, if they were really influenced by the charge, all of the witness's evidence was intended.

Impeaching testimony is one thing, impeached testimony is another. When testimony is impeached it is not to be considered at all. *White v. McLean,* 47 How. Pr. 193, 199. To say that, if you find the testimony of a witness has been impeached, that is, come to the conclusion it is untrue, then you may reject it if you see fit, seems so plainly absurd that the jury must have concluded the judge did not mean that.

We cannot say the jury probably gave it some sensible meaning. They must have rejected it.

Of course, if a jury comes to the conclusion that a witness's testimony is untrue it is their duty to reject it. They have no discretion in the matter. That does not have to do with

the rejection of testimony, not necessarily impeached, because of some false item of evidence given by the same witness, found to have been wilfully given as true.

Again the words: "If you find that the testimony of any witness has, when you consider the whole evidence, been impeached, then you may reject the testimony of such witness entirely if you see fit, unless it is corroborated by some testimony or by some evidence which you believe to be true," involve dense ambiguity. On its face it is a clear absurdity. There can be no such thing as corroboration of evidence or testimony, found upon the whole evidence to be untrue, so as to render it worthy of belief. How can evidence of a witness, found upon the whole case to be untrue, be corroborated by any other evidence in the record believed to be true? Does not the existence of the former exclude the latter?

Without further analysis of the troublesome instruction, we pass it as was done in *Buel v. State,* 104 Wis. 132, 80 N. W. 78, as so involved as not to be prejudicial because the jury did not in any reasonable probability receive any guidance from it, one way or the other. There was no request on the part of the accused on the subject supposed by them to have been aimed at by the faulty instruction.

The jury were instructed thus: "You will not reject the testimony of any such witness unless you find the testimony of such witness in conflict with the truth." The context shows that the endeavor of the trial court at this point was to impress upon the jury the fact that the evidence of the accused, *Bromley,* should be considered and weighed and given effect to by the rules governing the treatment of the evidence of any other witness. Following that, and rounding out the sentence, the quoted words were used.

Counsel suggests that such words conveyed the idea to the jury that they were authorized to reject the testimony of a witness which they believed to be in conflict with the truth. Or in other words, we take it, reject the testimony of a

witness which they believed to be untrue. That is doubtless right. Wherein is the infirmity? We cannot discover any. Of course, they were not only authorized, but it was their duty to reject such testimony. That is so plain that the jury did not need any special instructions in respect to it.

This language was given to the jury:

"You will not be justified in disregarding your convictions simply because you are acting as jurors when you would be satisfied to act upon such convictions based upon the same facts which would satisfy you and impel you to act in the most sacred and most important transactions which you are called upon to perform as individuals."

That was given as the last part of a paragraph, the preceding part of which was in these words:

"While you should be cautious and scrutinize all of the evidence introduced, not only by the defendants but by the state, and give the testimony of each witness such weight as you believe from the evidence that it is entitled to receive, you will bear this in mind: that if the evidence convinces you in this case of guilt, and such guilt is established by the full measure of proof," etc.

Counsel liken this to the instruction in *Anderson v. State,* 41 Wis. 430, given in explanation of reasonable doubt, which was to the effect that circumstances sufficient to move a reasonable man to act or not, guided by the care governing him in his "ordinary affairs," are sufficient to raise a reasonable doubt calling for acquittal in a criminal case; and to the instruction in *McAllister v. State,* 112 Wis. 496, 504, 88 N. W. 212, in explanation of reasonable doubt, where the term "graver transactions of life" was used instead of "the most important affairs of life." A mere glance at the court's language convinces that it is not open to the criticism of counsel. The words "most sacred and most important transactions which you are called upon to perform as individuals" is quite different from one's "ordinary affairs" or his "graver affairs." It is at least equivalent to "his own most

important affairs and concerns of life," approved in *Butler v. State,* 102 Wis. 364, 78 N. W. 590, as not prejudicially wrong, but suggested in *McAllister v. State, supra,* not to be followed as a model. It is also quite equivalent to "their own gravest and most important affairs of life," approved as permissible in *Secor v. State,* 118 Wis. 621, 636, 95 N. W. 942.

Why not use the phrasing of so important a principle which has been approved as strictly accurate over and over again, instead of venturing to use one which may be merely considered permissible, or mildly and not prejudicially wrong, yet be fruitful of so much difficulty to public and private interests? Why not say that, *if one has a doubt which would cause an ordinarily prudent man to pause and hesitate to act in the most important affairs of life,*—he has a reasonable doubt within the meaning of that term as used in the universal law? *McAllister v. State, supra.* Or if the idea is to be given exclusively as in this case, why not use the words approved in *Secor v. State, supra,* or similar words:

"Guilt is proven beyond a reasonable doubt when all the evidence in the case, clearly, impartially, and rationally considered, is sufficient to impress the judgment of ordinary reasonable and prudent men with a conviction upon which they would act without hesitation in . . . the most important affairs of life."

However, it seems that the instruction as a whole, in connection with later full instructions on the meaning of reasonable doubt and the presumption of innocence, must have meant to the jury:—if you are convinced as men from the evidence of guilt by the full measure of proof, *i. e.* beyond a reasonable doubt; to that degree of certainty "which would satisfy you and impel you to act in the most sacred and most important transactions of your lives, you should not disregard your convictions and act differently because you are jurors." We cannot condemn the instruction though we cannot commend it as worthy to be followed as a perfect example.

Complaint is made because the jury were told that it was important for them to consider whether McGowan or any of his companions were armed, or *Bromley* had reason to believe that they were, as bearing on his claimed justification for using his rifle, and it was said, in effect, that it was not to be presumed without evidence, that one would do an unlawful act, such as carrying concealed weapons. We perceive no error in that. On the whole, it was, perhaps, too favorable to the accused, since, as we have indicated, there was little or no reason whatever—the latter it seems—for the accused to believe his adversaries were armed or that they were so in fact.

Error is assigned because the court said:

"If you believe and find from the evidence that defendant *Bromley* first assailed the deceased, Thomas McGowan, for the purpose of provoking an affray and difficulty with the deceased, Thomas McGowan, and that said *Bromley* intentionally conducted himself so as to bring on the assault and affray as it took place in his house, then the said defendant is not entitled to the plea of self-defense." And:

"If any assault was committed by the late Thomas McGowan on any of the men present there in the house as a result of such conduct of defendant *Bromley,* he is not excused or justified in the shooting which took place immediately afterwards."

The instruction cannot be justified. Clearly what occurred in the house did not necessarily preclude the accused from exercising his right of self-defense regardless thereof some time afterwards outside the house. There is nothing to show that what occurred outside, immediately preceding the homicide, was necessarily a part of the transaction which commenced in the house. The latter had ended. McGowan had left and *Bromley* had a right to prohibit him from returning, and had a right to stand his ground against an invasion of his premises or an attack upon himself, not presently wrongfully efficiently induced by him. However, what has already been

said makes the instruction nonprejudicial, because there was no condition, reasonably calling for exercise of the right of self-defense, at the time the fatal shot was fired.

The sheriff, who first had *Bromley* in custody, testified that he said, when *Miller* was neither present nor represented by counsel, "she handed me the gun." The officer who held the preliminary examination testified that *Bromley* said before him, "*Miller* did not do anything but hand me the gun;" neither of the accused being then represented by counsel. The question put to the sheriff on the subject was objected to, but solely because *Miller* was not present when the declaration was made. The question to the examining magistrate was not objected to at all. The court was requested on behalf of *Miller* to instruct the jury to disregard the evidence of both the sheriff and the examining magistrate, because the statement of *Bromley* in neither case was in her presence. The requests were refused and the court instructed the jury that:

"When evidence has been admitted in the trial of a case tending to establish conspiracy, any declaration made by either of the conspirators, even if made in the absence of the other, is admissible in evidence although only one conspirator may be on trial, and the jury may act upon it. This rule applies to any declaration or admission, if you find that any such was made by the defendant *Bromley,* as to any act done or thing said by his codefendant, *Belle Miller,* which tends to show she in any way aided in compassing the death of the late Thomas McGowan."

The instruction as to the sheriff's evidence should have been given as it was mere hearsay, and as to both because the admissions of one of two persons concerned in a criminal act, after the fact, are not evidence against the other. Those principles are very familiar. The mere inaccuracy of counsel in reciting that *Miller* was not present when the statement was made the second time, and in not grounding the request on the fact that an admission after the fact by one is

not evidence against the other, should have been obviated by the court. In such a serious case, facing such a plain situation, governed by such very plain rules, the trial court should not allow the rights of an accused person to be jeopardized, imperiling such person with danger of imprisonment for life, because a correct request is not based on the proper ground. We agree with counsel for the accused, *Miller,* that the rule in *Montgomery v. State,* 128 Wis. 183, 107 N. W. 14, is to that effect, and if not it should be sufficiently developed to meet the case. '

That admissions of one of two or more co-conspirators, after the fact, are not evidence against his associate; that only such declarations are evidence as are made during the prosecution of the conspiracy, seems too elementary to require discussion. The rule is laid down in standard works thus:

"When the common design is at an end, whether by accomplishment or abandonment, no one of the conspirators is permitted by any subsequent act or declaration of his own to affect the others." Whart. Crim. Ev. (9th ed.) § 699.

That doctrine is universal and is as old as the common law at least. *Baker v. State,* 80 Wis. 416, 50 N. W. 518; *Schutz v. State,* 125 Wis. 452, 104 N. W. 90; *Schultz v. State,* 133 Wis. 215, 222, 113 N. W. 428.

The court not only committed plain error by not excluding the evidence of *Bromley's* declarations as to *Miller,* but intensified the same in a high degree by giving the instruction to the effect that the objectionable evidence was entitled to consideration if evidence had been introduced "tending to establish conspiracy." That is, the jury were definitely informed that if evidence before them tended to prove a conspiracy existed between *Bromley* and *Miller* respecting the transaction in question at the time thereof, then declarations of *Bromley* either before or after the consummation of it were evidence against *Miller.* The crowning error therein is that mere evidence tending to prove a conspiracy was made suffi-

cient to give efficient dignity to the declarations of one of the alleged conspirators against the others. It does not seem profitable to discuss error so plain.

It is fundamental in the law of evidence that the rule making declarations of one conspirator evidence against the other is subsidiary, not only to the rule that they must be before conclusion of the purpose of the combination, but to the more basic rule that there must first be evidence establishing, in the judgment of the court, *prima facie,* the fact of conspiracy, the ultimate question in that regard being for the jury and to be found, in cases of this sort, beyond a reasonable doubt, preliminary to considering the declarations, except as to the one making them. Whart. Crim. Ev. (9th ed.) § 698; 3 Stark. Ev. 235 (vol. 2, 7th Am. ed., 327); Roscoe, Crim. Ev. 417, 418; Jones, Ev. § 254 (255).

We will close this discussion by saying that we do not now decide that, since the evidence above involved was not properly objected to, the only objection at any point being that the declarations were not in *Miller's* presence, it was necessarily harmful error to refuse to instruct the jury to disregard it. As hearsay evidence, of course, it did not in any event prove anything, yet it may possibly have been misleading even considered as hearsay. Whether it did, probably, under the circumstances, considered as mere hearsay, as mere declarations in absence of the person affected, we need not express an opinion. It is sufficient that it was offered as *res gestæ,* received as such, asked to be stricken out under such circumstances that the court should have granted the request, then given full effect as *res gestæ,* conditioned upon an event, not efficient for that purpose, under any circumstances. In that particularly prejudicial situation, there is no escape from the conclusion that it was harmful to *Miller,* since it is plain from the evidence that there may have been a felonious design to kill on the part of *Bromley,* not participated in in the slightest degree by her.

Error is further assigned on behalf of *Miller* because the court said to the jury that, if she "had any just cause for complaining against said McGowan, she should have taken the same into court, for no person is justified under the law in taking the law into his own hands." That, of course, involved a judicial suggestion that there was evidence tending to prove that *Miller* took the law into her own hands by participating in the shooting of McGowan, and in characteristics of it essential to the full offense charged. The court probably would not have given that instruction had it been appreciated that the declarations of *Bromley* above discussed were not evidence against *Miller*. Under all the circumstances heretofore shown, and a situation yet to be discussed, the instruction was prejudicial.

It is suggested that the court committed error in charging the jury that they could not, in any event, convict one defendant of one offense of criminal homicide and the other of another.

The learned trial court seems to have proceeded on the theory that the evidence was sufficient to show a conspiracy, and if *Miller* was connected with the homicide at all it was, necessarily, pursuant to a preconceived plan to slay McGowan or to do him some grievous bodily harm, antedating the commencement of the affray in the house, including the assault she made on McGowan with the bottle, and that all things done up to and including the final consummation,—were but steps or circumstances in carrying out the preconceived plan. We cannot see it that way. *Miller* may have had an understanding with *Bromley* to punish McGowan, which was operative up to and inclusive of the fatal act, and yet she not have had the remotest idea of taking his life or doing more than to chastise him roundly for having abused her upon some previous occasion. She may have participated in a design to assault him if he came back for his hat, pursuant to which design *Bromley* went out to lie in wait for the

return which he naturally expected.  If she did there is no more than a well grounded suspicion thereof.  He must have apprehended that, on that cold March night, McGowan would not go on his long journey home, minus his coat and hat.  It was possible that the design to kill was formed in his mind before he went out with the rifle, or after he went out and *Miller* had no such extreme purpose, or reasonable ground to expect such on the part of *Bromley,* yet they have been in perfect harmony as to inflicting bodily harm upon McGowan with or without heat of passion on her part, rendering her guilty of some lower degree of criminal homicide than the highest.

There is left on the merits to be considered exceptions to the refusal to discharge *Miller* because of there being no evidence to warrant conviction of her for any offense included in the information, and the exception to the refusal to grant a new trial because of the verdict being without evidence to support it.  They will be considered together.

We have already seen, the declarations of *Bromley* as to *Miller's* connection with the homicide, to which the learned circuit judge gave great significance, were not competent evidence against her and should have been withdrawn from consideration of the jury.  With those declarations out of the case, we are at a loss to see any definite evidence that the woman participated in the design to kill or had anything to do with the trouble after the riot in the house ended.  There is the merest scintilla of evidence that she was seen with the gun in her hand and, at best, a well grounded suspicion that she obtained the gun from the north room and gave it to *Bromley* in the room where the affray took place, but after it was over.  She made no threats.  She did not use a gun at the time there were two available.  She did not say anything to *Bromley* about shooting McGowan.  She seems, from the evidence, to have dropped entirely out of sight before *Bromley* went out to stand before his door in wait for Mc-

Gowan, whom he expected to return for his coat and hat. For aught that appears, except by mere surmise, she did not have any connection whatever with the difficulty, after McGowan was driven from the house, much less participate in the wicked design formed in the mind of *Bromley* to slay him.

In view of the very shadowy connection, at least, of the woman with the scene which commenced when *Bromley* stepped out with his rifle and culminated with the fatal act, is there any fair room in the evidence for a conviction beyond any reasonable doubt that she is guilty of any offense of criminal homicide? How can we say, with that consideration for human liberty due to the humblest individual, that such a situation would not be so uncertain as to cause one to pause and hesitate in the most important affairs of life, much less that in any reasonable view it warrants a conviction which would impel a reasonably prudent man to act in the most important affairs of life? Is there any room in the record for such saying? After careful search we have been unable to find any.

To analyze here the evidence showing clearly and in detail the basis for our conclusion would extend this opinion to a very great length. It is not best to do that. The general reasons given must suffice. Had the court not informed the jury they could not find *Miller* guilty of a lesser degree than they did *Bromley,* they doubtless would have rendered a far different verdict as to her. Had they not been made to understand that if there was any sort of understanding between the two as to chastising McGowan, then her overt connection with the difficulty commencing when she used the bottle on the deceased necessarily continued to the end and *Bromley's* purpose at the last was her purpose, and had they not understood that the declarations of *Bromley* after the fact were strong evidence against her, it seems certain that they would have acquitted her. Moreover, had the court viewed the

case uninfluenced by errors we have seen occurred, doubtless the woman would have been discharged before the final close of the trial for want of evidence to convict her.

A question of practice is raised as to whether, conceding that motions in arrest of judgment were made before the motion for a new trial, the latter were not waived, foreclosing all questions dependent thereon.

The learned attorney general takes the affirmative of the foregoing, relying upon the practice before the Code. There is no question but that the motion for a new trial was seasonably made and decided, unless it was waived in the manner claimed, and there is no question as to there having been any prejudicial delay in making the motion.

Now we will say, first, without taking time to go into the subject at length, that even under the common-law practice a motion for a new trial was not waived, as a matter of course, if it was preceded by a motion in arrest of judgment. Second, we have no such thing under the Code as a motion in arrest of judgment, in the technical sense with the common-law procedure and limitations appertaining thereto. We have the motion in arrest of judgment, so called, for the purpose of challenging the right to hold the accused notwithstanding the conviction upon grounds common to the ancient motion and also merely staying the execution of the judgment to admit of a convicted person having some remedy or taking some proceeding to save his rights in any proper way. But the whole matter is referable to the Code and rules of court and the unwritten law based thereon, dominated by the saving Code provision, where no express written limitation stands in the way, that "The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party. . . ." Sec. 2829, Stats. (1898).

The Code governs procedure in criminal as well as civil cases. A motion for a new trial may be made upon the same

grounds in one as in the other, so far as such grounds are applicable.

A challenge of the right to hold the convicted person no more supersedes the motion for a new trial than a challenge to the jurisdiction of the court over the subject matter supersedes the motion for a new trial in a civil case. The two motions may be made within the time prescribed by statute, regardless of order, and so argued and decided. There are no technicalities of the old practice in respect to the matter, interfering with the due course of justice, along the liberal lines of the Code. As an example of the subserviency of the ancient technicalities to our more liberal system, we have but to refer to *Ullman v. State,* 124 Wis. 602, 103 N. W. 6. '

*By the Court.*—The judgment as to the plaintiff in error *Stephen Bromley* is affirmed. The judgment as to the plaintiff in error *Belle Miller* is reversed, and the cause remanded with directions to grant the motion to discharge. The warden of the state prison is directed to deliver the said *Belle Miller* into the custody of the sheriff of Taylor county, she to be held in such custody until discharged pursuant to this direction.

Dodge, J., dissents in *Bromley v. State.*

A motion for a rehearing in *Bromley v. State* was denied April 20, 1909.