The People of Puerto Rico, Plaintiff and Appellee, *v.* Cándido Marrero Fernández et al., Defendants and Appellants.

No. 6362. Argued April 26, 1935.—Decided July 19, 1935.

*Agustín E. Font* for appellants. *R. A. Gómez, Prosecuting Attorney,* and *Luis Janer, Assistant Prosecuting Attorney,* for appellee.

Mr. Chief Justice Del Toro delivered the opinion of the court.

The material portions of the information on which this prosecution is based are as follows:

"In the District Court of Ponce, Puerto Rico, on the 27th day of June 1930.

"The District Attorney files this information against José Calazán Marrero, commonly known as Blanquillo Marrero, Juan Pedro Marrero, commonly known as Bobo, Cándido Marrero, commonly known as Macán, José Miranda and Pablo Pomales, for an offense of MURDER (FELONY), committed as follows:

"In that the aforesaid defendants, José Calazán Marrero, commonly known as Blanquillo Marrero, Juan Pedro Marrero, commonly known as Bobo, Cándido Marrero, commonly as Macán, José Miranda, and Pablo Pomales, did, on or about the 7th day of June 1930, in the ward of Caonilla Arriba in the place known as Dajao in the Municipality of Villalba, which forms part of the judicial district of Ponce, P. R., wilfully, unlawfully, deliberately, and with malice aforethought, each of such defendants showing that he has an abandoned and malignant heart unlawfully killed the human being Ramón Martínez Ríos, an insular policeman, assaulting and battering him with a dagger, a lethal weapon, and inflicting upon him several wounds in various parts of the body, some of which were serious, as a result of which the aforesaid Ramón Martínez Ríos died some hours later."

On July 24, 1930, the defendants demurred to the information, contending that in the form in which it was drafted it charged no public offense whatsoever, much less an offense of murder in the first degree, pleaded not guilty, and demanded a jury trial. The court overruled the demurrer, and permitted the plea of not guilty to stand.

On October 1, 1931, the defendants filed an application for a bill of particulars. This application was denied on the 5th, and on the 7th of that month the case was called for trial. The trial lasted until the morning of the 10th, when the jury rendered its verdict, finding Cándido and Juan Pedro Marrero guilty of murder in the second degree, finding José Miranda guilty of voluntary manslaughter, and finding José Calazán Marrero and Pablo Pomales not guilty.

The court entered judgment forthwith, discharging the defendants found not guilty, and fixed a day for pronouncing sentence against the defendants found guilty. These defendants filed a motion for a new trial, which was finally denied on November 17, 1931. On December 4th following, the court pronounced judgment, sentencing Cándido Marrero to be imprisoned in the penitentiary for twelve years, imposing a like punishment upon Juan Pedro Marrero, and sentencing José Miranda to imprisonment for six years.

Feeling aggrieved by that judgment, the defendants so sentenced appealed. The transcript, which contains 856 pages, was filed in the office of the secretary of this court on December 9, 1933. Appellants filed their brief on May 22, 1934, and the appeal was set for hearing on November 6, 1934. The prosecuting attorney (Fiscal) of this court, with the consent of the appellants, moved that the hearing be continued. The hearing was again set and then continued by stipulation. The case was finally heard on April 26, 1935, on which date it was submitted to the court for consideration and decision.

Appellants assign the commission of twenty-six errors by the trial court, and argue them at length. The first relates to the bill of particulars, and the second to the constitution of the jury. The sixth refers to a certain hostility in the attitude of the trial judge, and the seventh and eighth to statements made by the district attorney in his argument to the jury. In the twentieth assignment, the instructions delivered by the court to the jury are challenged. In the

twenty-first, it is contended that the verdict of the jury is contrary to the law and the evidence, and in the twenty-second, that a new trial ought to have been granted. The remaining fourteen assignments refer to the reception of the evidence.

■ Let us examine the question relating to the bill of particulars. The information is before us. The defendants, believing it insufficient for their defense, asked the court to order the district attorney to give them further particulars on the following points:

"(A) The circumstances surrounding the perpetration of the act.

"(B) A specification of the wounds suffered by the deceased Ramón Martínez Ríos, and the nature of such wounds.

"(C) The specific participation of each co-defendant in the assault and battery, and the wounds inflicted by each upon Ramón Martínez Ríos.

"(D) Which of the defendants used a dagger, or if each of the defendants used a dagger, what was the dagger like, and at what moment, in the chronological order of events, was the dagger used?"

We know the information. In our opinion it is sufficient, since it sets forth all the essential elements of the crime with which defendants are charged, and is sufficiently direct and certain to permit defendants properly to prepare their defense.

The district court could perhaps have granted something of what was asked, adopting a liberal attitude more in harmony with the authorities upon the subject (*People* v. *Pacheco,* 33 P.R.R. 217; *People* v. *Ramírez, et al.,* 28 P.R.R. 292; 49 C.J. 626); but it is impossible to hold that the court abused its discretion in acting in the manner in which it did. It does not appear from the record that defendants were prejudiced.

The restricted view taken by the trial court finds support in the decision of this Supreme Court in the case of *People* v. *Vélez,* 32 P.R.R. 355. It was there said:

"The appellant complains that he was not apprised by the information that he was accused of having aided or abetted in the shooting, but that the information solely and exclusively charged him with the shooting. The question is then whether when a man has a separate tr'al and the information, presented against several, charges the shooting alone, the defendant may complain of a lack of notice that he was charged with the homicide.

"Independently of all statutes which make an accessory before the fact a principal, the law was that anybody present aiding and abetting was a principal. In *Mackalley's Case,* 9th Coke, 67 B, 77 Reprint, 832, the following words were used:

" 'So if A. B. & C. are indicted for killing J. S. and that A. struck him and that the others were present, procuring, abetting, &c, and upon the evidence it appears that B. struck, and that A. and C. were present, &c. in this case the indictment is not pursued in the circumstance; and yet it is sufficient to maintain the indictment, for the evidence agrees with the effect of the indictment, and so the variance from the circumstance of the indictment is not material; for it shall be adjudged in law the wound (stroke) of every one of them, and is as strongly the act of the others, as if they all three had held the weapon, &c. and had all together struck the deceased. . . . .'

"In *Sir John Heydon's Case,* 11 Coke, 5 B, 77 Reprint, 1151, it was said that the act of one is the act of all of the same party being present, and in *Commonwealth* v. *Chapman,* 11 Pick. 428, it was said: 'Evidence that a person was present aiding and abetting would support an indictment charging him a sole principal, with having struck the blow with his own hands.' Other reasoning to the same effect is to be found in some of the cases that we shall cite hereafter for another purpose.

"Even if defendant had merely aided and abetted in the killing without actually being present, an information which charges the killing is sufficient to convict anyone who formerly would, as a general matter, have been known as an accessory before the fact. The matter alleged as error is covered by section 36 of the Penal Code as follows:

" 'Section 36.—All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid or abet in its commission, or, not being present, have advised and encouraged its commission and all persons counseling, advising, or encouraging children under the age of fourteen years, lunatics or idiots, to commit any crime, or who, by fraud, contrivance, or force, occasion the drunken-

ness of another for the purpose of causing him to commit any crime, are principals in any crime so committed.'

"And more particularly by section 93 of the Code of Criminal Procedure, as follows:

" 'Sec. 93.—All persons concerned in the commission of a felony, whether they directly commit the act constituting the offense or aid in abetting its commission, though not present, shall be prosecuted, tried and punished as principal, and no other fact need be alleged in the information against them other than is required in the information against the principal.' "

Likewise it is supported by our recent decision in *People* v. *Coto, ante,* pp. 143, 144, thus:

"The information filed against the appellant and Arcadio Colón charges that on June 30, 1930, at Coamo, P. R., the defendants did wilfully and unlawfully, with malice aforethought and with the deliberate intention of unlawfully killing Juan Marrero Hernández, a human being, feloniously assault and batter the said Juan Marrero Hernández, with a hammer, a deadly weapon, thereby fracturing his skull, which fracture caused the death of the said Juan Marrero Hernández almost instantaneously.

"At the arraingment the attorney for both defendants made a motion requesting the court to order the district attorney to file a bill of particulars stating which of the two defendants had battered Juan Marrero Hernández with the hammer, but the court denied the motion. Then the defendants requested separate jury trials. The motion for the bill of particulars was renewed by the appellant on the day set for his trial, before the jury was impaneled, and the same was again denied.

"This denial is assigned as the first error on this appeal.

"The information clearly charges the defendants with the crime of murder and it fulfills the requirements of section 71 of the Code of Criminal Procedure, since it states the facts constituting the crime in such plain and concise language that any person of ordinary intelligence can understand from it that the defendants did, feloniously and with malice aforethought, kill Juan Marrero Hernández by fracturing his skull with a hammer. No further particulars as to which one of the defendants dealt the blow causing death were necessary, as this is a matter of evidence and the appellant did not show in the trial court, nor has he shown to us, that the lack of the particulars requested by him has prevented or hampered his defense.

in any way, inasmuch as he had knowledge of those facts. We are of the opinion, therefore, that the trial court did not abuse its discretionary power to order the information to be made more specific.''

■ Let us consider now the second assignment of error.. When the jury was being chosen, and neither of the parties. had exhausted their peremptory challenges, the district attorney was asked if he had any peremptory challenge to interpose, and he answered: ''For the moment, no.'' The defense then moved the court to rule that if the prosecution did not commence such challenges and did not challenge, the prosecution would have no right to challenge thereafter. The court denied the motion. The district attorney was thereafter permitted to make a peremptory challenge to a juror, and the defense took an exception.

Section 229 of the Code of Criminal Procedure provides:

''All challenges to an individual juror, except peremptory, must be taken, first by the defendant or his counsel, and then by the prosecuting attorney, and each party must then exhaust all his challenges before the other begins.''

Section 231 of the same code further provides:

''If all the challenges on both sides are disallowed, either party, first the prosecuting attorney and then the defendant, may take a peremptory challenge, unless the parties' peremptory challenges are exhausted.''

These sections seem to sustain the defendants' contention. Nevertheless, although the same provisions are in force in California, the authorities in that State, as summarized in Pomeroy's ''Codes of California Annotated—Penal Code,'' page 390, are to the effect that:

''Where the prosecution passed the panel to the defendant, who declined to make any challenge, the prosecution may be permitted to interpose a peremptory challenge to one of the panel: *People* v. *McCarty*, 48 Cal. 558. See *People* v. *Doolan*, 96 Cal. 315, where the prosecution was allowed to challenge peremptorily a juror who had been passed by the people, after once passing him. See, also *Silcox* v. *Lang*, 78 Cal. 118, and *People* v. *Majors*, 65 Cal. 138, 52 Am. Rep.

295, to the same effect. And the prosecution may challenge a juror after he has been sworn, where good reasons are shown therefor: *People* v. *Bemmerly, 87* Cal. 117.''

This is moreover a question which rests to a considerable extent in the discretion of the court. See the cases of *People* v. *Torres,* 48 P.R.R. 38, in which an analysis is made of the decisions in *People* v. *Munera,* 39 P.R.R. 267, *People* v. *Rivera,* 37 P.R.R. 706, and *People* v. *Vázquez,* 20 P.R.R. 338, and in which rules are laid down bearing upon the question here involved.

Moreover, although it might be found that the action of the court was not strictly in accordance with the law, the error would not be of sufficient importance to warrant a reversal of the judgment, since the jury was finally accepted by both parties. The following colloquy appears on page 130 of the record:

''Prosecuting Attorney Pérez Almiroty. No further question, Your Honor.—Court. The defense, peremptory. . . —Defense. We have no peremptory challenges. The jury is accepted.—Court. Then the jury is accepted by both parties. Is the jury accepted by both parties?—Both parties. Yes.—Defense. Yes, sir.—Court. Then let it take the final oath.''

Defendants find the hostile attitude of the district judge, which is the subject of the sixth assignment of error, in the following extract, appearing at page 640 of the record:

''DEFENSE. When the witness Daniel Rivera or Figueroa testified, we laid the basis for discrediting his testimony. For that purpose we are going to use the testimony of Nemesio Santiago.

''SWORN TESTIMONY OF NEMESIO SANTIAGO.

''COURT. Look, speak in a loud voice, so that you may be heard when you are questioned. If I have to tell you three times to speak in a loud voice, I am going to punish you for contempt, because you would be then disobeying what I tell you. Take care to speak in a loud voice. Let the defense proceed.

''Q. What is your name?

''A. Nemesio Santiago.

''Court. That is very low.

"A. Nemesio Santiago.

"Court. Louder. Shout it.

"A. Nemesio Santiago.

"Court. That's right.

"Q. Where do you live?

"A. In Ortiga.

"Q. To what do you devote yourself?

"A. I devote myself to telling the truth.

"Court. No. To what work do you devote yourself? Your occupation, your work?

"Q. Your occupation, your work?

"A. I, to working in a small hotel."

Really the judge had no need to warn the witness about contempt, and that fact, considered as an isolated incident, arrests the attention. If, however, all the incidents of the trial are carefully followed, and the many times that the judge was obliged to warn the witnesses to speak in a loud voice are taken into consideration, what happened is explainable; and it does not appear that the testimony of the witness was influenced in one way or another, or that the defendants suffered the slightest prejudice.

 The same is true of the seventh and eighth assignments. The seventh is formulated as follows:

"The district attorney, at the beginning of his argument to the jury, stated to the members of the jury that the people in the place where the policeman was going (the defendants' house) were bad people. The defense interrupted the prosecution, and stated that the reputation of the defendants had not been the subject of any evidence; that the district attorney could not enter upon this field for that reason, and for the further reason that if the defense had not raised the question of the reputation of the defendants, the prosecution was estopped to do so. The district attorney admitted his error (see page 787 of the record); but persisted in it, making the following comment, as though in praise, while he addressed the jury: 'The defendants are very good men!' (Record, pp. 786, 787)."

The eighth assignment reads thus:

"The prosecuting attorney, in addressing the jury, commented improperly upon the terms of a decision of this Supreme Court in

the habeas corpus proceeding submitted to this court (*Marrero* v. *People,* 41 P.R.R. 689). (Record, pp. 792, 793.)''

It is not stated what the comment was, nor does it appear from the record.

The statement of the supposed error made by defendants themselves is sufficient to hold that what is involved is a mere deviation from good practice, not amounting to error sufficient to warrant a reversal of the judgment; deviations which were, moreover, corrected in the first instance by the district attorney himself, and in the second by the court, which, as appears on page 793 of the record, said to the jury:

''Court.—The court is going to intervene. The court is going to make the following statement to the gentlemen of the jury: There has been some reference here to a habeas corpus proceeding. When a habeas corpus proceeding is decided, what is decided is whether there is a basis for proof, whether there is sufficient proof to justify an arrest, but no final decision is made as to the guilt or innocence of the defendants. That question is now for this jury to decide when the case is turned over to it for its consideration and decision. This jury is the only one which ought to decide as to the guilt or innocence of the defendants. That is what a habeas corpus proceeding means; but the decision which the Supreme Court may have rendered does not prejudge the final decision of this case, which is, upon the evidence introduced, for decision by the jury. That is the real legal question.

''Defense.—Exactly.

''Court.—Then there is no need to discuss this point further.''

We will not stop to state at length our opinion as to the errors assigned relating to the reception of the evidence and to the instructions to the jury. Appellants have set them out and discussed them one by one in their brief, and the prosecuting attorney *(Fiscal)* of this court has explained and answered them one by one in his. They all deal with questions already decided by the authorities, and after careful consideration of all the surrounding circumstances, we are in a position to state that none of them, if committed, would be serious enough to require a reversal of the judgment. A

thorough study of the record shows how well and fully the defendants were defended, the impartiality of the court, and the careful and liberal actions of the jury in weighing the evidence as it did, finding two of the defendants not guilty, and the other three guilty only of second-degree murder and manslaughter. The impression which a reading of the record produces in the mind of the reader is so strong that upon finishing it, he hears in his conscience only a voice which says that the most which the jury could have done in favor of the defendants and still have remained faithful to its oath, was to act in the manner in which it did. This brings us to the twenty-first assignment, by which it is contended that the verdict is contrary to the law and the evidence.

First in the order of proof was the testimony of Dr. López Nussa and Dr. Américo Serra. The former examined Ramón Martínez Ríos in a Ponce hospital in the early morning of June 8, 1930, and then operated upon him. The latter made an autopsy on his body some hours later. The deceased had three slight wounds, one in the face and two in the lumbar region, and three serious wounds, one in the thorax which penetrated the pleura, another which affected the liver, and another which perforated the large intestine, all caused by a cutting instrument such as a dagger or a knife. Death occurred about three o'clock in the afternoon of the same day, as a result of hemorrhage and acute peritonitis, according to the testimony of Dr. López Nussa; from hemorrhage and shock caused by the wounds, according to Dr. Serra.

Who was Ramón Martínez Ríos, and how and by whom was he wounded? Cándido Ramos, a peddler, testified at the trial that on the night of June 7, 1930, he went with his tray of sweets, together with his son Ramón Ramos, to the house of the defendant José Calazán Marrero, in Villalba, ward of Caonilla Arriba, in the place known as "Dajao," where there was a dance, and stationed himself in front of the door leading into the canteen which belonged to the defendants José

Miranda and Cándido Marrero, and was located in the house. Cakes, bread, candy, and liquor were sold there.

After the dance had started, Ramón Martínez Ríos, an insular policeman dressed in uniform, arrived. He tethered his horse. He made a turn about the place where the sweet-sellers were and stopped by their side. Some one asked for a drink of rum in a loud voice; the policeman heard him, entered the house, and seized the liquor. While this was going on, the owners of the canteen heaped abuse upon him, to which he answered, when leaving on his horse with the liquor, "I am going to take it to Limón, I am coming back later."

In point of fact, he came back about half an hour later, fastened his horse, went up to the balcony of the house and stood in front of the door. José Calazán asked him please to ·go away, and took him by the arms. At that point the defendant Pedro Marrero, who was standing behind José Calazán, hit him in the head. The policeman fell down and while he was down José Miranda and Cándido Marrero stabbed him several times with a dagger.

The witness saw no weapon on Miranda. Cándido had a knife which the witness saw first in the canteen, and after the police had gone, in his belt. Upon being asked whether the policeman had drawn his revolver, he answered: "How could he draw it, if he was knocked down on the ground?"

José Calazán helped to get the people off the deceased, and to carry him into the house where he gave him a little milk to drink.

The next witness to be called was Ramón Ramos, who was with his father, assisting him in his business, and he corroborated his father's testimony.

Following Ramos and his son, Daniel Figueroa, a farm laborer who was watching the dance, took the witness stand. He stated that he saw the policeman Martínez arrive twice, the first time about 9 o'clock in the evening when he seized the liquor which was under the counter of the canteen, in

bottles. The canteen belonged to José Miranda and Cándido Marrero. Miranda told him that he had no authority to seize the liquor and he answered that he had to comply with the law. After he went away, "Cándido Marrero put a knife in his belt."

The policeman came back alone on horseback, and when he got to the door, José Calazán told him "Go away, Martínez, there is danger here," and he got hold of him by the arms, at the moment in which Juan Pedro Marrero hit him in the right temple. "He fell to the ground; and upon falling to the ground, Cándido Marrero came and stabbed him in the chest, and he struck him again right here."

The policeman asked Juan Marrero to help him and Juan Marrero came up and said "The one that hits Martínez again, has got to kill me." They took him up to the house, sat him down on a bench, and José Calazán gave him a drink of milk. Afterwards, they took him in a hammock to the Limón farm of MacJones and there put him in a bus to take him to Ponce.

Juan Ortiz was then called as a witness. He is only 14 years old. He is a member of the Marrero family and was looking on at the dance. He knew the policeman and was present when the policeman was going up to the dance, and José Calazán told him: "Go away, Martínez," and when Pedro Marrero said: "I am as much a man as he is," and hit him on the left temple, and the policeman "was knocked down and fell to the ground." After he had fallen, "Cándido Marrero stabbed him." "As he stabbed him, I became afraid." And he ran. He waited in the road until they passed with the policeman in the hammock, and he went along behind as far as Limón.

Juan Marrero was playing the *güiro* (a musical instrument made of a gourd) at the dance. He saw the policeman both times. The second time "when I heard the commotion, I put the *güiro* down and went to the window, and when I went to the window, Marrero, Blanquillo,

was holding him by the shoulders . . . Pablo Pomales, by the legs . . . and José Miranda disarmed him and Macán stabbed him with the dagger right here, but I do not know whether the knife went through here or through here . . . I threw myself down so as not to see him striking him any more . . . and about ten minutes later I went out to see him . . . He was seated . . . I drew near . . . he was bleeding here, from the face; and he opened his eyes and said to me 'Juan, get the horse, and go tell them.' Then, when I went to get the horse, Tití Marrero took the bridle from me . . . I drew aside and went to my brother and said 'Antonio, shall I go or not?' Then I called to the witness there, Figueroa, and took the bridle in my hand, got on the horse and went to the *hacienda* and told MacJones, the American in Villalba," what had happened.

Rosa Burgos, one of the women at the dance, was called as a witness for the People. She heard José Calazán say to Martínez, "Go away," and saw Cándido Marrero throw himself upon Martínez. She went into a room and saw nothing more. A moment later she came out and "I saw Martínez seated. He was trying to wipe himself off and could not; I then took the handkerchief away from him and wiped him off . . . the blood which he had here . . . I asked him 'Do you know who hit you?' —'Yes.' —'Who hit you?' —'José Miranda and Cándido Marrero.' —But I drew back and went away. He was alone. Seated . . . and I became frightened and left . . . He stayed there talking to himself . . ." The defendant Cándido Marrero is her brother-in-law. José Miranda is not a member of her family.

The next witness was Arturo Figueroa Plata, a day laborer, who reached the dance after the attack. "When I saw him (the policeman), he was already wounded and was seated on a bench. . . I asked Don Blanco how this had happened in his house . . . he told me that it had happened in about five minutes and that he had known nothing about it. . . The policeman Martínez Ríos then said to me: 'Ar-

turo, come here' . . . He said to me: 'Don Blanco took hold of me, Macán wounded me, Pablo Pomales wounded me, and José Miranda wounded me, and Bobo struck me here' . . . He told me to take him away because he was very bad off . . . I asked for a hammock . . . Mr. Blanquillo . . . sent for one . . . and when he was ready I put him in the hammock and went away with him." He was accompanied by Herminio Figueroa, Félix Ortiz, Juan Rodríguez, and Daniel Figueroa. They took him to the Limón farm where "Mr. MacJones already had a car ready . . . and sent me with him to the district hospital in Ponce."

On the road the Justice of the Peace of Villalba took a short statement from the policeman, the presentation of which in evidence gave rise to several objections. The district attorney could well have overlooked it, and avoided unnecessary complications, since all that it contained was already before the jury through the testimony of Arturo Figueroa and Rosa Burgos.

We shall consequently disregard the testimony of the Justice of the Peace of Villalba, Jesús María Santiago. Similarly, we shall pass over the testimony of Juan Soltero and Leandro Curet, both insular policemen, and the written statement of the defendant Pomales, the presentation of which gave rise to numerous objections and exceptions, when what was involved was a mere repetition of what had already been stated in ample detail by the eyewitnesses above mentioned. We may say that the People introduced other evidence of less importance, and conclude our analysis by referring to the testimony of Juan Marrero Torres, a witness characterized by the district attorney as hostile; a statement which gave rise to another lengthy argument.

He lived in Coamo, where he had a store. He went to the dance given in the house of his uncle, José Calazán Marrero. He knew the policeman Martínez. It is apparent that he sought to avoid any statement that might tend to incriminate any particular person. A lover of music, he was playing

a *"plena"* when the events took place. The people stopped dancing, the women ran into another room, and he went toward the place where the policeman was lying on the ground surrounded by a number of people.

Upon being asked about their names, he answered: I do not recall any, because my sole idea was to save him, and I went very rapidly to where he was . . . he told me that he was wounded . . . he was bleeding from the left temple. . . . I lay down on top of him and protected him, putting my chest against his, I felt a scratch . . . upon my left shoulder . . . I do not know who did it . . . to the people standing around I said 'If you are going to kill him, you have to kill me first' . . . when I got up there was no one there and . . . he (Martínez) was seriously wounded . . . I took him to a bench in the sitting room . . . I took off his cap . . . he said that he was hot . . . then I saw that his shirt was stained with blood . . . I did not hear any shot.''

On cross-examination he stated that he heard the policeman say: ''Don Blanco, don't let them kill me,'' to which Don Blanco answered: ''No one is going to hit you; they don't hit a man when he is down.''

The defense then presented its evidence. It was admitted that a dance was being held in the house of the defendant José Calazán Marrero, that the policeman Martínez came there, and that the liquor was seized. The evidence tended to show that such seizure was improper, and that the policeman threatened to come back and finish with the ''tough guys'' *(guapos)*; that in fact he came back in spite of having met Felipe Vázquez on the road and having been warned by him not to do so, and that upon arriving he said, ''I am coming to see how tough you really are''; that José Calazán intervened in an attempt to avoid any encounter and said to him ''Martínez, do not do this to me in my house''; and as one of the witnesses said in his own words, ''then they pulled him down, the group of people there pulled him down; and then when they pulled him down he said, 'Don Blanco,

don't let them kill me, don't let them kill me' . . . Don Blanco said that nobody would hit a man when he was down."

This evidence leaves in the dark the names of the actual perpetrators of the crime, although it contains inferences which seek to point to the son of the sweet-seller, Ramón Ramos, a witness for the prosecution, as the one who stabbed Martínez.

Most of the efforts of the defense were directed toward discrediting the witnesses for the prosecution, but these efforts in our opinion have had just the opposite effect, since what stands out in the whole proceeding as something entirely true is the existence of threats upon the part of the Marreros to hinder a clear statement of the facts and to confuse the preliminary investigation. Time passed. The waters again sought their level. The witnesses felt themselves protected and upon being called, they testified fully at the trial.

It is difficult in a brief summary to restate justly and accurately evidence as voluminous as that introduced in this case. We have sought to make reference to the essential features and to omit everything which was objected to as inadmissible, and we think, the jury having believed the testimony of the eye-witnesses for the prosecution, that what we have set out shows clearly and unavoidably the guilt of the appellants.

The jury could have convicted them all. It did not do so. The evidence with respect to the owner of the house, Blanquillo, José Calazán Marrero, was susceptible of two interpretations, and the jury adopted the interpretation most favorable to his innocence. It concluded that when he took the policeman by the arms, at the moment chosen to strike the blow in the left temple which threw him to the ground, he did so not as part of a plan of attack, but out of a desire to avoid trouble. The jury believed what some of the witnesses said with respect to his later intervention, in seeking to prevent them from continuing to hit the deceased while he was on the ground, in relieving his thirst, and in provid-

ing the hammock in which he was taken to Limón, and acquitted him.

The jury reached the same conclusion with respect to Pomales. His intervention in the matter, according to some of the testimony, might have been considered as that of direct coöperation, making him a principal. Nevertheless, since the charges were not definite, the jury preferred to give him the benefit of the doubt, and acquitted him.

In the case of Miranda, who was found guilty of voluntary manslaughter, there is a further showing of how careful the jury was and of its desire, carried to the limit, to be merciful as well as just. It could have found him guilty of murder. There was abundant evidence of his direct intervention in the attack which resulted in the death of Martínez some hours later, but the jury thought, perhaps, that his failure to use any weapon justified the characterization of his action as that of manslaughter.

With respect to the Marreros, Juan Pedro and Cándido, commonly known as Bobo and Macán, their acts are brought out so clearly and definitely by the evidence that they could not be characterized other than as they were, that is, as murder. Furthermore, even to these defendants the jury was merciful, since although they could have been convicted of murder in the first degree, the jury only convicted them of second degree murder.

It is true that the policeman had no need to go to the dance a second time. Granting that he was not only a brave man, but a stubborn one, and that his second arrival was arrogant and challenging, even so, there is not the slightest proof that he attacked any one or that he made any use of his weapons. He was attacked and thrown to the ground while held by the arms, and he was immediately stabbed, suffering the wounds which caused his death. These facts, even considered in a light most favorable to the defense, would in any event constitute murder.

■ Appellants insist that the verdict is contrary to law, for the reason that the jury could not, within its powers, find two of the defendants guilty of murder, and another of manslaughter. According to the authorities it could.

The prosecuting attorney of this court in his brief quotes the following excerpt from Brill's Encyclopedia of Criminal Law, p. 460:

"At common law an accessary cannot be guilty of any other or higher grade of crime than that of which the principal is also guilty. And generally the guilt of the principal in the second degree, or of one who is present aiding and abetting, is measured by the intent of the one actually committing the offense. If he enters into the commission of the offense with the same intent and purpose, then his offense will be of the same degree as that of the actual doer. But it is now generally held that principals, accessaries, and aiders or abettors may be convicted of different grades or degrees of a crime, according to the respective intents. This has often been held to be true in homicide cases, for example. So it has been held that an accessary, or principal in the second degree, or an aider and abettor, in a homicide may be found guilty of murder in a higher or lower degree than the actual perpetrator of the crime, or may be convicted of murder though the perpetrator has been convicted of manslaughter, or of manslaughter though the perpetrator has been convicted of murder. And the same rule has been applied in prosecutions for assault with intent to kill or murder, or with intent to commit rape."

In the case of *Leslie* v. *State*, 42 Tex. Cr. 64, 57 S. W. 659, decided by the Court of Criminal Appeals of Texas it was declared that where a defendant—

". . . . is a principal in the second degree, if the facts call for it he is not to be tried solely according to the intent of his principal in the first degree, but is to be tried according to the intent with which he may have participated."

Furthermore, in the case of *Miller* v. *State*, 139 Wis. 57, 119 N. W. 850, decided by the Supreme Court of Wisconsin, it was held, in effect, that—

"Where two persons conspire to attack another, and one of the parties does not participate in the design to kill, and the person

attacked is killed by the other party, the defendants may be convicted of different degrees of homicide.''

The verdict is not, therefore, contrary to the evidence or to the law, and since the court did not commit the final error assigned, numbered twenty-two, which bears upon the refusal to grant a new trial, the appeal must be dismissed, and the order and judgment appealed from affirmed.