STATE, Respondent, vs. WHITNEY, Appellant.

*March 16—May 15, 1945.*

*Gerald L. McDonough* of Milwaukee, for the appellant.

For the respondent there was a brief by the *Attorney General, William J. McCauley,* district attorney of Milwaukee county, and *John S. Barry,* deputy district attorney, and oral argument by *Mr. Barry.*

BARLOW, J.   The principal assignments of error relied upon by the defendant, Frank Louis Whitney, are: (1) That the court should have granted defendant's motion for adjournment; (2) that there is not sufficient credible evidence to support the verdict of the jury; (3) that defendant did not have a fair trial.

Defendant was arrested September 4, 1943, and after a preliminary examination was arraigned in municipal court on September 21, 1943, at which time he had no attorney. The case was adjourned until September 24th to enable defendant to obtain an attorney and fix a day certain for trial. On September 24th defendant appeared and claimed to have employed an attorney, but the attorney did not appear. After waiting for some time the court learned the attorney was out of the city, and set the case for trial October 4, 1943, at 10 o'clock in the morning. October 4th, defendant appeared with

another attorney and made application for a further adjournment, to which the state objected as it expected to use as one of its witnesses a soldier who had been transferred to a camp near Chicago, Illinois, and he was present in court at that time. The witness informed the court that he expected to be in camp near Chicago for an additional two months, but was not certain this would be true. The attorney for the defendant informed the court at that time that he expected to rely upon an alibi as a defense, and the court instructed the attorney to serve written notice under sec. 355.085, Stats., on the district attorney by October 13th, and by agreement of the attorneys the case was set for trial on October 18, 1943, at 9 a. m. October 13th defendant, through his attorney, asked for a further adjournment to file his written notice of the facts claimed as an alibi, which the court denied, ordering the notice to be filed forthwith, and again announced that the case was set for trial October 18th.

October 18, 1943, defendant, by his attorney, made an oral motion for a further adjournment, stating that he had been unable to find the alibi witness, stating that he had advertised in the papers the day before in an effort to locate the witness. The court denied the motion and ordered the trial to proceed. Defendant claims this was prejudicial error, and that the witness was very important, claiming that the witness would have testified that the defendant was in her company from shortly after 12 o'clock until nearly 2 a. m. on September 4th. This would have been important testimony for the defendant if it could have been produced, but he had six weeks from the date of his arrest to locate this witness, whose residence was in the city of Milwaukee, and no proof was offered that there was any possibility of locating the witness or that any real effort had been made to locate her, prior to the date of trial. "Judicial action upon an application for a continuance is a matter resting largely in the sound discretion of the trial court, and its refusal to grant it will not be interfered with unless resulting in manifest prejudice to the party asking it." *Mainville v.*

*State* (1920), 173 Wis. 12, 16, 179 N. W. 764; *Miller v. State* (1909), 139 Wis. 57, 119 N. W. 850; *State v. Christiansen* (1936), 222 Wis. 132, 267 N. W. 6.   It is considered that there was no abuse of discretion on the part of the trial court in denying the motion for a further continuance.

In considering the next assignment of error relied upon by the defendant—that there is not sufficient credible evidence to support the verdict of the jury—it is considered that a general summary of the evidence introduced at the trial is sufficient to establish that there is no merit to defendant's claim.

Margaret Oppermann, prosecutrix, was born July 1, 1926, and on September 4, 1943, was in good health, weighing between one hundred thirty and one hundred forty pounds.   She attended Girls Tech high school for one year and attended vocational school one year.   She was employed as telephone operator by the telephone company in May, 1943, and at the time of the alleged assault was in the employ of the telephone company, taking care of the trouble board.   Defendant was forty-two years of age, and weighed one hundred forty-two pounds the week before his arrest.

Margaret Oppermann met her girl cousin downtown in the city of Milwaukee on the evening of September 3, 1943, and after doing some shopping they met two soldiers at about 9 p. m.   They went to Lakota's restaurant on North Sixth street and West Wisconsin avenue about 9:45 p. m., where they watched a floor show and had two bottles of beer each. About 11 p. m. they walked west on West Wisconsin avenue to North Eighth street, where they conversed a while and then separated, Margaret's cousin and her soldier friend walking on.   Margaret and her soldier, Joseph Watts, went to the North Eighth street steps of the public library-museum building.   After sitting on the steps for a while they went to the alley on the north side of the building to a more secluded spot. The soldier made some unwelcome advances, but Margaret refused.   Finally she returned to North Eighth street to meet her cousin.   Joseph Watts stayed in the alley.   She stood near

the library steps and defendant approached her in an apparently official manner, demanding to know her business and suggesting she should wait for her cousin at the corner. She went to the corner, and remembering that she had the soldier's ring, returned to the alley, called to the soldier but received no response. The defendant approached her again and questioned her as to her relations with the soldier, stating that it was his duty to check into such relations. They then noticed that the soldier was sitting on the library steps, and walked back to where he was sitting, and Margaret returned his ring. Defendant offered to take the soldier to camp, which offer was refused. The defendant then directed Margaret Oppermann to accompany him and took her north to West Wells street, thence west to North Ninth street, and then defendant caused her to accompany him to his fourth-floor room in apartment 16 in the Essex apartment building at North Ninth and West Wells streets.

While they were walking to the Essex apartments, defendant questioned Margaret Oppermann about her work, her nationality, her past, and other matters of information, and when they reached the apartment building he said the lady who was supposed to examine her must be in. He said something about an office or regular room where they examine people. The Essex apartment building is near the Safety building. Defendant went into the entrance and examined the mailboxes and then came out and questioned Margaret Oppermann again. He told her the night before he had caught two girls who had been with soldiers and told him they had not had intercourse, but he found out they had, and he was not going to take a chance. They entered the building, went upstairs, he leading the way and she following, and entered a room. There was a double bed, a dresser, and several couches in the room they entered, which was a bedroom.

Defendant cautioned Margaret Oppermann several times against talking loudly, examined her clothing for what he

stated was evidence of intercourse. When he demanded to see her underclothes she accused him of not being a detective. He then put his hand over her mouth to prevent her screaming, held her down on the bed and forcibly had intercourse with her. He told her several times to be quiet or he would kill her. They then left the building. Margaret Oppermann asked to be taken to a ladies' rest room, and he took her into the Magister tavern on West Wells street, where she went into the ladies' room. When she came out defendant had disappeared. She inquired and was informed that he had left the tavern, and she then became hysterical, telling the people present what had happened. She was taken to police headquarters in the Safety building. Detectives took her to the apartment building, which was the scene of the crime. There were three entrances to the apartment building, and she was confused as to the identity of the one she had used. She was then taken to the hospital, examined, treated, and put to bed. Later she was permitted to go home, and at 6 o'clock in the morning returned to the apartment with the police. At this time she recognized objects about the room. The defendant was in the room and she immediately recognized him. A physical examination of Margaret Oppermann by two doctors established that the hymen was torn and the edges around the tear were red and swollen. In their opinion it was a recent tear.

Defendant claims he attended a dance at the Friendship club that evening. The Friendship club is located between North Sixth and North Seventh streets on West Wisconsin avenue. Lakota's restaurant is across the street. The public museum is one and one-half blocks west of the Friendship club, at the northwest corner of North Eighth street and West Wisconsin avenue. West Wells street is one block north of West Wisconsin avenue. Defendant's apartment is on West Wells street at the northeast corner of its intersection with North Ninth street. The Magister tavern is on West Wells street,

two blocks east of the defendant's apartment. The Friendship club closed at 12 o'clock, midnight. He talked with the hostess right at closing time. She testified she saw him walk down the stairs and walk east to North Sixth street alone. He testified that after leaving the Friendship club he stopped at the Subway inn, a tavern and night club, on North Fifth street, between Wisconsin avenue and West Wells street, ordered a glass of beer, drank it, and started to leave when a woman spoke to him. He had met her at dances but did not know her name. They drank a beer together and had two dances. She then decided to go home. He walked up to Seventh street and Wisconsin avenue with her, and they took the bus together. Returning from escorting the lady home, he claims he reached the downtown district about 2 a. m., went to a restaurant on North Fourth street and West Wells street, and had coffee and a sandwich, and then walked up Wells street, until he reached his apartment about 2:45 a. m., entered, undressed, and went to bed.

Defendant denied that he was with Margaret Oppermann at any time, claimed that he did not know her and had never seen her, and denied that he had intercourse with her. Defendant admitted nine previous convictions.

Assuming that the defendant attended the dance at the Friendship club on the night of September 3d and left there at approximately 12 o'clock, he was only one and one-half blocks east of where Margaret Oppermann claimed he first talked with her. Considerable emphasis is placed on the fact that Margaret Oppermann had first testified that it was sometime shortly after 11:30 when she first saw the defendant, and later changed her testimony, stating that it was 12 o'clock or shortly thereafter when she first saw the defendant. Margaret Oppermann also testified that after she and her cousin met the two soldiers they went to Lakota's restaurant and the four of them remained there until about 11 o'clock, and that each of

them had two bottles of beer. Joseph Watts, her soldier friend, testified that they were at Lakota's restaurant only a very short time and that the proprietor refused to sell them any drinks, and that they went to another tavern, and later to the museum. There was a discrepancy between the testimony of Margaret Oppermann and Joseph Watts with reference to whether the defendant talked to Margaret Oppermann at two separate times that evening, as she testified. Defendant claims this is sufficient to discredit her entire testimony. We cannot agree with defendant's contention. There is evidence to the effect that Joseph Watts was not feeling well while he was with the complaining witness and had been nauseated, which the jury could properly consider in analyzing the discrepancies. Where the parties may have been earlier in the evening is not material, and whether Margaret Oppermann talked with the defendant once or twice prior to the time she went with him, and the importance of this testimony are questions for the jury. "Conflicts in the evidence and the inferences which could be reasonably drawn therefrom resulted in but questions for the jurors." *O'Neil v. State* (1941), 237 Wis. 391, 398, 296 N. W. 96, 135 A. L. R. 719; 2 R. C. L., Appeal and Error, p. 193, sec. 167; 3 Am. Jur., Appeal and Error, p. 441, sec. 887; 3 Wharton, Crim. Ev. (11th ed. 1935) sec. 1411.

The testimony of Margaret Oppermann that she was in the company of this defendant on September 4th is corroborated by Joseph Watts, who testified that this defendant talked with him and Margaret Oppermann at the museum on the night in question; by William Magister, the proprietor of the Magister tavern, which is the tavern where Margaret Oppermann claimed she was taken by the defendant after the alleged crime was committed, and by Gladys Regan, who was in the tavern at the time the defendant came to the tavern with Margaret Oppermann. Gladys Regan testified that defend-

ant and Margaret Oppermann came to the tavern at about twenty five or thirty minutes after midnight, according to her best recollection.

The testimony of Margaret Oppermann that the defendant had intercourse with her at the time in question is supported by the testimony of two physicians, one of whom examined her on the morning of September 4th, and the other made an examination shortly thereafter, who testified that the hymen was torn, the edges around the tear red and swollen, and that in their opinion it was a recent tear.

The complaining witness is a seventeen-year-old girl, and there is testimony by both her and Joseph Watts that the defendant made statements which led them to believe that he was a public official, and it is the testimony of the complaining witness that the defendant ordered her to accompany him to a place where she would be subjected to a physical examination. It is evident that she was complying with what she believed to be official rules of the city authorities, so that her accompanying the defendant to the place where she claims he took her is wholly consistent with a willingness on her part to comply with the proper health rules of the city.

The fact that she became hysterical as soon as she knew she was free from the defendant and made a complete statement of what had happened was proper to be considered by the jury in arriving at the weight to be given to her testimony. The rule is well established that where there is any credible evidence, which in any reasonable view supports a verdict in a criminal case, it cannot be disturbed on appeal. *Johnson v. State* (1927), 192 Wis. 22, 211 N. W. 668. It is considered that there is ample credible evidence to sustain the verdict of the jury.

To sustain his contention that he did not have a fair trial, defendant claims that the deputy district attorney asked leading questions and showed partisanship in the trial. An exam-

ination of the record shows that while some leading questions were asked, whenever objections were made they were sustained by the court. It is considered that there is nothing in the record to show that defendant did not have a fair trial.

There is some criticism made of the charge of the court to the jury. We have given the matter careful attention and consider that the charge on the whole was fair and comprehensive, and contained no prejudicial error.

*By the Court.*—Judgment of the municipal court is affirmed.